ASHLEY D. POSNER (California Bar No.: 106195)
Email: ashleyposner@gmail.com
**POSNER LAW CORPORATION**
15303 Ventura Boulevard, Suite 900
Sherman Oaks, California 91403
Telephone No. (310) 475-8520
Facsimile No. (818) 986-2203

**HILLYER LEGAL, PLLC**
Gregory L. Hillyer *(Admitted Pro Hac Vice)*
Email:  ghillyer@hillyerlegal.com
5335 Wisconsin Avenue, N.W.
Washington, D.C. 20015
Telephone:   (202) 686-2884
Facsimile:    (202) 686-2877

*Attorneys for Plaintiff,*
TRINITY INFO MEDIA, LLC

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| TRINITY INFO MEDIA, LLC<br><br>Plaintiff,<br><br>v.<br><br>COVALENT, INC.<br><br>Defendant, | Case No. 2:21-cv-01360-JWH (MRW)<br><br>**PLAINTIFF TRINITY INFO MEDIA, LLC'S OPPOSITION TO DEFENDANT COVALENT, INC.'S MOTION TO DISMISS**<br><br>Judge: Hon. John W. Holcomb<br>Hearing Date:  May 28, 2021<br>Time:  9:00 am<br>Courtroom: 2 |

# TABLE OF CONTENTS

I.  INTRODUCTION…………………………………………………...1

II.  BACKGROUND…………..………………………………………...3

   A.  The Prior Art…………………………………………………….3

   B.  The '321 Patent……………………………………………….….3

   C.  Relevant Procedural Background……………………………….7

III.  GOVERNING LAW…………………………………………………8

   A.  Federal Rule of Civil Procedure 12(b)(6)………………………...8

   B.  Patent Analysis Under Alice's Two-Step Test……………………9

      1.  Step One…………………………………………………9

      2.  Step Two………………………………………...…10

IV.  ARGUMENT…………………………………………………………11

   A.  The '321 Patent Is Presumed Valid Under § 101…………………11

   B.  The Claims Of The '321 Patent Are Patent Eligible Under Step One…….12

   C.  The Claims Include "Inventive Concepts" Under Step Two……………...19

   D.  It Was Legal Error Not To Address All Claims…………………………..22

   E.  At A Minimum A Formal Claim Construction Is Required………………22

   F.  At A Minimum Fact Discovery Is Required…………………………….23

      1.  Fact Discovery Is Relevant To The Court's § 101 Analysis………..23

      2.  Fact Discovery Should Be Allowed To Proceed……………………24

V.  CONCLUSION………………………………………………………25

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128

4

(Fed. Cir. 2018) …………………………………………………………….21, 23

5

*Aatrix Software Inc. v. Green Shades Software, Inc.*, 890 F.3d 1354, 1355

6

(Fed. Cir. 2018)…………………………………………………………………11

7

*Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1340-41

8

(Fed. Cir. 2013)……………………………………………………………………..9

9

*Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014)……………..9, 10, 19

10

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)………………………………………..8

11

12

*Bascom Global Internet Servs., Inc. v. AT&T Mobility, LLC*, 827 F.3d 1341, 1350

(Fed. Cir. 2016)……………………………………………………...10, 11, 20, 21, 23

13

14

*Bancorp Servs., LLC v. Sun Life Assurance Co. of Can.*, 687 F.3d 1266, 1273–74

(Fed. Cir. 2012)…………………………………………………………………23

15

16

*Berkheimer v. HP Inc.*, 881 F.3d 1360, 1369 (Fed. Cir. 2018)……………...20, 23, 24

17

*Bilski v. Kappos*, 561 U.S. 593, 601 (2010)……………………………………….9

18

*Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975)…………………..24

19

20

*Bozeman Fin. LLC v. Fed. Reserve Bank of Atlanta*, 955 F.3d 971

(Fed. Cir. 2020)…………………………………………………………………..17, 19

21

22

*Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1319 (Fed. Cir. 2019) ……11, 20, 21

23

24

*Core Wireless Licensing S.A.R.L. v. LG Electronics, Inc.*, 880 F.3d 1356, 1359–63

(Fed. Cir. 2018)…………………………………………………………………16

25

26

*Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1054–56

(Fed. Cir. 2017) …………………………………………………………………...19

27

28

*Cronos Techs., LLC v. Expedia, Inc.*, 2015 WL 5234040, at *3

(D. Del. Sept. 8, 2015)……………………………………………………………23

*Data Engine Technologies LLC v. Google LLC*, 906 F.3d 999, 1007–08 (Fed. Cir. 2018)…………………………………………………………………...16

*DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1255 (Fed. Cir. 2014)……………………………………………………………10, 11, 18

*Diamond v. Chakrabarty*, 447 U.S. 303, 308-09 (1980)………………………………..9

*Fairwarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1093 (Fed. Cir. 2016)……19

*Elec. Power Group., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016)…....18

*Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2019)….9, 10, 15, 18

*Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1305–06 (Fed. Cir. 2018)……...16

*Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009)………………………..8, 12, 13

*Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1375 (Fed. Cir. 2016)………..10

*Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015)…………………………………………………………………………10

*Koninklijke Kpn N.V. v. Gemalto M2M GMBH*, 942 F.3d 1143, 1151 (Fed. Cir. 2019) ……………………………………………………………………...16

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 71 (2012)………9

*McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016) …………………………………………………………………….10, 17

*Mendiondo v. Centinela Hosp. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008)…..……...8

*Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 100 (2011)……………………11, 12

*Morsa v. Facebook, Inc.*, 77 F. Supp. 3d 1007, 1013 (C.D. Cal. 2014)……………...19

*Mortgage Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324 (Fed. Cir. 2016)………………………………………………………….…………9

*MyMail, Ltd. v. ooVoo, LLC*, 934 F.3d 1373 (Fed. Cir. 2019)….………..………..23

*Papst Licensing GmbH & Co. KG v. Xilinx Inc.*, 193 F. Supp. 3d 1069, 1091
(N.D. Cal. 2016)…………………………………………………………………17

*Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998)……………………………..8

*Pure Data Systems, LLC v. Ubisoft, Inc.*, 329 F.Supp.3d 1054, 1068
(N.D. Cal. 2018)…………………………………………………………………21

*Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1048
(Fed. Cir. 2016)……………………………………………………………..…….16

*SAP Am., Inc. v. Investpic, LLC*, 260 F.Supp.3d 705, 715 (N.D. Tex. 2017)……….24

*Skelluerup Industries Limited v. City of Los Angeles*, 163 F.R.D. 598 (1995)………24

*Slyce Acquisition, Inc. v. Syte – Visual Conception, LTD*, 2020 WL 278481, *6-7
(W.D. Tex. January 10, 2020)……………………………………………...2, 23, 24

*SRI International, Inc. v. Cisco Systems, Inc.*, 930 F.3d 1295, 1304
(Fed. Cir. 2019)……………………………………………………………………18

*Teradata US, Inc. v. SAP SE*, No. 20-cv-06127-WHO (N.D. Cal. Feb. 1, 2021)…...19

*Uniloc USA, Inc. v. LG Electronics USA, Inc.*, 957 F.3d 1303, 1307
(Fed. Cir. 2020)…………………………………………………………………...16

*Weber v. Dep't of Veterans Affairs*, 521 F.3d 1061, 1065 (9th Cir. 2008)…………..8

*Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1259–60 (Fed. Cir. 2017)….16

*Voter Verified, Inc. v. Election Sys. & Software LLC*, 887 F.3d 1376
(Fed. Cir. 2018)…………………………………………………………….17, 21

**Statutes**

35 U.S.C. § 101………………………………………………..2, 9, 11, 12, 23, 24

35 U.S.C. § 282………………………………………………………………….11

Federal Rule of Civil Procedure 12(b)(6)……………………………..2, 7, 8, 11, 21

Federal Rule of Civil Procedure 26(d)(2)……………………………………7, 24

Federal Rule of Civil Procedure 26(f)……………………………………...2, 7, 24

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

1

## I.   INTRODUCTION

Prior to the inventions described and claimed in U.S. Patent Nos. 9,087,321 ("the '321 Patent") and U.S. Patent No. 10,936,685 ("the '685 Patent"), traditional internet-based matching operations were performed with antiquated processors, requiring users to provide entire fields of information before a single database could be searched for other users with similar preferences.  The equipment, process and timeframe associated with these protocols were cumbersome, slow and inefficient.

Trinity Info Media, LLC ("Trinity") developed a better approach using specific systems, methods and products directed to, *inter alia*: (1) progressive polling that immediately matches a user with other users in real time; (2) employing one or more processors, match servers, user identifications (IDs) and/or a match aggregator for the receipt, storage and searching of data; (3) carrying out one or more matching operations on a handheld device (*e.g.*, a mobile phone); (4) a computer program product in the form of a matching application (*e.g.*, an "app"); and (5) displaying potential matches that are reviewable through the act of swiping (*e.g.*, running a thumb or finger across the screen of a device).  None of these non-abstract solutions, either as a whole, or in the ordered combination recited in the claims, were known in the prior art, nor do any of these improvements constitute a monopoly over any "mental process."

Given the functionality of the "Kippo App," Trinity filed a Complaint against Covalent, Inc. ("Covalent") for infringement of the '321 Patent.  After the '685 Patent subsequently issued on March 2, 2021, Trinity filed an Amended Complaint to add infringement under this patent as well.  In response to the initial Complaint, Covalent filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for one admitted reason: Covalent infringes the '321 Patent.  D.E. 24, Motion to Dismiss.  Covalent recently informed Trinity that it intends to file yet another motion to dismiss on the same grounds regarding the '685 Patent (and for the same reason).

Covalent cannot meet its high burden of overcoming the presumption of validity, and proving by clear and convincing evidence, at the pleadings stage, with no claim

construction and no record evidence, that all of the elements of the claims of both the '321 and '685 Patents, as a whole, or as an ordered combination, are abstract ideas under 35 U.S.C. § 101.  Likewise, Covalent cannot meet the equally high burden of proving that the claimed subject matter was routine, well-known or conventional to one of ordinary skill in the art as of the priority date (over a decade ago) particularly when the allegations in the Amended Complaint to the contrary must be accepted as true.

The Motion to Dismiss itself is flawed and must be denied because it ignores the specification, omits crucial claim limitations, fails to consider claim construction, offers no evidentiary support and relies solely on attorney argument.  The Motion to Dismiss also focuses on a single claim while the other claims do not suffer any of the alleged § 101 infirmities.  In an effort to have it both ways, Covalent has refused to participate in the required Rule 26(f) conference which is precluding service of early fact discovery under Rule 26(d)(2) directed to infringement of additional claims.

At a minimum, genuine issues of claim construction and material fact exist—including whether the claimed subject matter preempts any abstract ideas or was considered conventional activity to one of ordinary skill in the art as of the priority date—that preclude granting the Motion to Dismiss at this early stage.  Another factor that weighs heavily on denying Covalent's § 101 challenge is that the test is difficult to apply and known to yield inconsistent, and at times inequitable, results.  *Slyce Acquisition, Inc. v. Syte – Visual Conception, LTD*, 2020 WL 278481, *6-7 (W.D. Tex. January 10, 2020) (denying motion to dismiss and providing judicial criticisms).[1]

---

[11]  "As Judge Plager stated, 'The law . . . renders it near impossible to know with any certainty whether the invention is or is not patent eligible.'" *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1348–56 (Fed. Cir. 2018).  Former Chief Judge Michel echoed this sentiment in testifying before the Senate Judiciary Committee, "If I, as a judge with 22 years of experience deciding patent cases on the Federal Circuit's bench, cannot predict outcomes based on case law, how can we expect patent examiners, trial judges, inventors and investors to do so?" *The State of Patent Eligibility in America: Part I: Hearing Before the Subcomm. on Intellectual Prop. of the S. Comm. on the Judiciary*, 113th Cong. 2 (2019); likewise Judge Linn expressed that "the abstract idea exception is almost impossible to apply consistently and coherently…" *Smart Sys. Innovations, LLC v. Chi. Transit Auth.*, 873 F.3d 1364, 1377 (Fed. Cir. 2017).

## II. BACKGROUND

### A. The Prior Art

The inventions of the '321 Patent represent significant advances over the prior art, improve the previous functionality of general-purpose computers and confer other advantages over earlier matching protocols.  D.E. 22, Amended Complaint ("AC"), ¶26.  Before the invention, a plethora of social networking websites shared common characteristics that merely allowed users to engage in activities over the internet using traditional computers, *i.e.*, desktop or laptop.  *Id.*, ¶26.  Some of these internet-based networking websites allowed users to create profiles and find friends.  *Id.*  However, to find friends, users were required to complete entire fields as part of their profiles which permitted a search of a single database where other user profiles were stored.  *Id.*

While traditional websites may have queried the user solely for the purpose of classifying the user in predefined categories with similar groups of people, such sites could not (and did not) provide a *progressive* poll query that, in *real-time*, matched the user with other users based on using unique identifiers (IDs) within each of the polls taken.  *Id.*, ¶27.  Accordingly, a poll-based networking system, method and products, employing specific hardware, software and logic, that is capable of instantly matching a user, in real-time, with other users, while accounting for all of the polls taken by the users, represents a significant advance over the art.  *Id.*

### B. The '321 Patent

The application that led to the U.S. Patent No. 9,087,321 ("the '321 Patent"), entitled "Poll-Based Networking System," was filed on November 22, 2010.  D.E. 22, Exhibit 1.  After almost five years of prosecution before the United States Patent and Trademark Office, the application issued as the '321 Patent on July 21, 2015.  *Id.*

The invention of the '321 Patent has three principal aspects.  The first aspect is poll-based networking system in the form of a computer system having one or more data processors operating software which provides various functionalities and works in cooperation with various devices, such as a handheld device (*e.g.*, mobile phone, etc.).

3

*Id*., col. 5, lns. 6-13.  The second aspect is a computer implemented method in the form of software and logic that generates unique identifications and uses a unique processing system.  *Id*., col. 5, lns. 12-14.  The third aspect is a computer program product with computer-readable instruction means stored on a readable medium, such as an application (*e.g.*, "app") deployed on a handheld device.  *Id*., col. 5, lns. 15-23.

Figure 1 of the '321 Patent illustrates the novel poll-based networking system capable of producing an on-line network of users.  D.E. 22-1, the '321 Patent, Fig. 1.



The way in which the claims carry out this ordered combination of operations is far from an abstract idea or mental process.  The inventors unexpectedly discovered that employing a plurality of specific hardware, including processors, match servers and/or a match aggregator would allow this non-traditional system to rapidly connect multiple users with progressive polls that compare answers *in real time* based on their unique identifications (ID).  D.E. 22-1, the '321 Patent, col. 1, ln. 56 - col. 3, ln. 24.

As shown above, at initiation, the processor(s) receive information from a user to generate a specific user profile.  *Id*., col. 5, lns. 58 - 60.  Each match server within a plurality of match servers is assigned a distinct subset of users.  *Id*., col. 7, lns. 4-8.  After saving the user profile, the user is provided with a first polling question with a finite set of answers having a unique identification.  *Id*., col. 5, lns. 60 - 65.  Upon receipt of an answer with a unique identification, it is transmitted from a web server,

1  through a match aggregator, to the plurality of match servers, in real time as polls are

2  answered. *Id.*, col. 6, ln. 64–col. 7, ln. 3. All match servers are therefore kept

3  synchronized. *Id.*, col. 7, lns. 2-3. Figure 3 of the '321 Patent is illustrative. *Id.*, Fig. 3.



12   The unique identification (ID) for each question and answer are embedded

13  within the poll, starting at 0 and going to N-1, where N is the number of answers. *Id.*,

14  col. 6, lns. 2 - 3. Each match server stores selected answers (N) as an in-memory, two-

15  dimensional array, with (n) bytes per selected answer and (m) rows per user (M). *Id.*,

16  col. 7, lns. 9-17. Figure 4 of the '321 Patent is illustrative. *Id.*, Fig. 4.



24   The use of a unique identification (ID) is integral to the bucketing of users and

25  their responses because it is an input into a hash function that "evens out" where the

26  user information is assigned within the plurality of match servers. Using these features,

27  the process by which polling answers are stored and subsequently compared is a unique

28

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

1    function that allows for nearly instant results. *Id.*, col. 6, lns. 53-55.

2           This design provides a very rapid comparison and aggregation of result values

3    even with a large number of polls and members. *Id.*, col. 7, 26-28. Specifically, the

4    in-memory, two-dimensional array provides for linear speed across all match servers

5    and an immediate comparison to determine if a particular user had the same answer to

6    that of another user with respect to a particular polling question. *Id.*, col. 7, 28-32.

7    Thus, each match server can quickly generate a likelihood of match between the user

8    and the subset of users by comparing the user's selected answers and their associated

9    unique identifiers to the selected answers and their associated unique identifies of other

10   users in its distinct subset. *Id.*, col. 7, lns. 9-17, 32-34.

11          The match aggregator then receives from each match server a likelihood of

12   match between the user and the other users (in each distinct subset). *Id.*, col. 7, lns. 35-

13   39. The match aggregator compiles the likelihood of matches from the plurality of

14   match servers in a result assembly, to generate the likelihood of match between the user

15   and each of the other users (which provides real time updates of the distributed match

16   servers). *Id.*, col. 7, lns. 39-44. The results are then organized into a result list which

17   is transmitted to the server for further processing. *Id.*, col. 7, lns. 44-47. Figure 5 of

18   the '321 Patent is illustrative. *Id.*, Fig. 5.



25          The server displays to the user profiles other users that are most similar and fall

26   within a predetermined threshold, which may be a match percentage. *Id.*, col. 6, lns.

27   31-34; col. 7, lns. 47-49. To determine the match percentage, the total number of

28   polling questions taken by a particular user and a selected other user is determined. *Id.*,

col. 6, lns. 34-37. Next, the number of same selected answers between the user and the selected other user is determined. *Id*., col. 6, lns. 37-38. The number of the same selected answers can be divided by the total number of polling questions to generate a match percentage between the two users. *Id*., col. 6, lns. 38-41.

When a user answers another poll, the user is matched to all other members based not only based on the poll the user just answered, but also all other polls the user previously answered to form another match percentage that is reported back to the user. *Id*., col. 6, lns. 42-47. The match percentage accounts for a maximum and minimum percentage as well as a maximum number of hits (*e.g.*, the application may request that the match server return the top 20 members with a 50% to 59% match). *Id*., col. 6, lns. 47-52. This system design provides for a unique method of sorting and storing question and answer groups to allow for rapid matching of potentially like-minded users.

The invention also includes an advance over the prior art and an improvement over a general-purpose computer by carrying out one or more of the above operations on a handheld device (*e.g.*, a mobile phone). *Id*., col. 8, lns. 35-39; AC, ¶30. Another advance is a computer-program product in the form of an application (*e.g.*, "app") stored on a compatible computer-readable medium. *Id*., col. 8, lns. 19-25; AC, ¶32.

## C.    Relevant Procedural Background

On February 15, 2021, Trinity filed its initial Complaint against Covalent for infringement of the '321 Patent. D.E. 1. On April 14, 2021, Covalent filed a Motion to Dismiss under Fed.R.Civ.P. 12(b)(6). D.E. 24. On April 27, 2021, counsel for Trinity advised counsel for Covalent of its intention to amend the Complaint to add infringement of the '685 Patent, which issued on March 2, 2021. Trinity requested Covalent's position as to whether the anticipated amendment would moot the pending motion to dismiss. Trinity also provided early Requests for Production of Document under Fed.R.Civ.P. 26(d)(2) requesting availability for a Fed.R.Civ.P. 26(f) conference which would effectuate service of the discovery.

On April 28, 2021, Trinity amended its Complaint to add claims under the '321 Patent and add infringement of the '685 Patent.  D.E. 28.  Trinity's counsel further requested a response to the earlier correspondence.  Counsel for Covalent responded that in its view the motion was not moot and that it would "file a new motion to dismiss for this amended complaint," requiring Trinity's instant response to the initial motion.

Notwithstanding the mandate under Rule 26(f) that "the parties must confer as soon as practicable," Covalent has repeatedly refused to participate, stating "it makes no sense to do one now with a motion to dismiss on the horizon and no hearing on the calendar."  Covalent reiterated this position during a telephonic meet and confer held between counsel on May 5, 2021.

## III.   GOVERNING LAW

### A.   Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure Rule 12(b)(6) permits a party to move to dismiss for "failure to state a claim upon which relief can be granted."  Fed.R.Civ. P. 12(b)(6).  However, "[d]ismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."  *Mendiondo v. Centinela Hosp. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  "While a complaint need not contain detailed factual allegations to survive a Rule 12(b)(6) motion, it must plead enough facts to state a claim to relief that is plausible on its face."  *Weber v. Dep't of Veterans Affairs*, 521 F.3d 1061, 1065 (9th Cir. 2008).  A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

When ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept "all factual allegations in the complaint as true and construe them in light most favorable to the non-moving party."  *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009).  The Court must also accept as true all reasonable inferences to be drawn from the material allegations in the complaint.  *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th

1    Cir. 1998).  Although patent-eligibility under § 101 is decided as a matter of law, "[t]his

2    legal conclusion may contain underlying factual issues."  *Accenture Global Servs.,*

3    *GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1340-41 (Fed. Cir. 2013).

### B.   Patent Analysis Under *Alice's* Two-Step Test

5        35 U.S.C. § 101 "defines the subject matter that may be patented under the Patent

6    Act."  *Bilski v. Kappos*, 561 U.S. 593, 601 (2010).  The Supreme Court has identified

7    three exceptions: "laws of nature, physical phenomena, and abstract ideas."  *Diamond*

8    *v. Chakrabarty*, 447 U.S. 303, 308-09 (1980).  The concern driving the relevant

9    exception is one of pre-emption, or preventing "a monopoly over an abstract idea."

10   *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014).

11       Courts have been cautioned to "tread carefully in construing this exclusionary

12   principle lest it swallow all of patent law."  *Id.* at 217 (citing *Mayo Collaborative Servs.*

13   *v. Prometheus Labs., Inc.*, 566 U.S. 66, 71 (2012)).  This is because, "[a]t some level,

14   all inventions embody, use, reflect, rest upon, or apply laws of nature, natural

15   phenomena, or abstract ideas."  *Id.*  "Thus, an invention is not rendered ineligible for

16   patent simply because it involves an abstract concept."  *Id.*  "Applications of such

17   concepts to a new and useful end, remain eligible for patent protection."  *Id.*

### 1.   Step One

19       Courts apply a two-step analysis to determine whether patent claims are directed

20   to ineligible subject matter.  In step one, a court must "determine whether the claims at

21   issue are directed to one of those patent-ineligible concepts."  *Id.*  If not, the claims

22   pass muster under § 101 and the inquiry ends.  *Mortgage Grader, Inc. v. First Choice*

23   *Loan Servs. Inc.*, 811 F.3d 1314, 1324 (Fed. Cir. 2016).

24       The Court of Appeals for the Federal Circuit has cautioned, in considering step

25   one, to not "describ[e] the claims at such a high level of abstraction and untethered

26   from the language of the claims [because doing so] all but ensures that the exceptions

27   to § 101 swallow the rule."  *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed.

28   Cir. 2019).  In particular, courts should not "simply ask whether the claims *involve* a

patent-ineligible concept, because essentially every routinely patent-eligible claim involving physical products and actions involves a law of nature and/or natural phenomenon—after all, they take place in the physical world." *Id.* at 1335-36 (emphasis in original). Rather, the correct inquiry is what the claims are "directed to," considered in light of the specification and based on whether "their character as a whole is directed to excluded subject matter." *Id.* (citing *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015)); *see also*, *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1375 (Fed. Cir. 2016) (inquiring into "the focus of the claimed advance over the prior art").

Claims directed to improvements in a computer's functionality are patent-eligible under step one especially when the focus of the claims is on the specific asserted improvement in computer capabilities. *Id.* Thus, a claim that provides "a specific means or method that improves the relevant technology" is not an abstract idea under *Alice*'s step one. *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016). Where a claimed invention "achieve[s] an improved technological result in conventional industry practice," it is not abstract, and the court need not reach step two. *Id.* at 1316.

### 2. Step Two

A court proceeds to step two of the *Alice* test only if it finds in the first step that the claims are directed to a law of nature, natural phenomenon, or abstract idea. *Alice* at 217-218. This step requires courts to "consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Id.*; *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1255 (Fed. Cir. 2014).

The Federal Circuit has clarified that "[t]he inventive concept inquiry requires more than recognizing that each element, by itself, was known in the art." *Bascom Global Internet Servs., Inc. v. AT&T Mobility, LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016). Indeed, "an inventive concept can be found in the non-conventional and non-

generic arrangement of known, conventional pieces." *Id*.  With specific respect to computer technology, an inventive concept will exist in claims that "recite a specific, discrete implementation of [an] abstract idea," where the "particular arrangement of elements is a technical improvement over prior art [methods]." *Id.* at 1350-51.  Claims directed to "a technology-based solution (not an abstract-idea-based solution implemented with generic technical components in a conventional way)…that overcome[] existing problems [in the art]" are patent-eligible under step two.  *Id.*; *see also DDR Holdings* at 1257- 1259 (holding that claims "amount[ing] to an inventive concept for resolving [a] particular Internetcentric problem" were patent-eligible).

Although the ultimate question of patent eligibility is one of law, "whether a claim element or combination of elements would have been well-understood, routine, and conventional to a skilled artisan in the relevant field at a particular point in time is a question of fact."  *Aatrix Software Inc. v. Green Shades Software, Inc.*, 890 F.3d 1354, 1355 (Fed. Cir. 2018).  At the Rule 12(b)(6) motion to dismiss stage, such factual questions "cannot be answered adversely to the patentee based on the sources properly considered on a motion to dismiss, such as the complaint, the patent, and materials subject to judicial notice."  *Id.* at 1128.

## IV.    ARGUMENT

### A.    The '321 Patent Is Presumed Valid Under § 101

Patents granted by the Patent and Trademark Office are presumptively valid. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 100 (2011) (citing 35 U.S.C. § 282). "This presumption reflects the fact that the Patent and Trademark Office has already examined whether the patent satisfies 'the prerequisites for issuance of a patent,' including § 101." *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1319 (Fed. Cir. 2019) (quoting *Microsoft*, 564 U.S. at 95–96).  Accordingly, the presumption of validity extends to patent eligible subject matter.  *Id.* ("To the extent the district court . . . [concluded] that issued patents are presumed *valid* but not presumed *patent eligible*, it was wrong to do so.") (emphasis in original).  Because "issued patents are presumed

to be valid[,]…an alleged infringer asserting an invalidity defense pursuant to § 101 bears the burden of proving invalidity by clear and convincing evidence." *Microsoft* at 95.

**B.   The Claims Of The '321 Patent Are Patent Eligible Under Step One**

Covalent's § 101 invalidity analysis is flawed for several reasons.  According to the Motion to Dismiss, Trinity's initial Complaint only asserted one claim.  Motion to Dismiss, p. 4.  This is inaccurate but moot in view of the Amended Complaint which asserts claim 1, and one or more of claims 2, 3, 8 and 10.  D.E. 22, AC, ¶54.

The Motion to Dismiss is predicated on the subjective conclusion that claim 1 of the '321 Patent is patent-ineligible because it is directed to "the idea of matching users who gave corresponding answers to a question."  Motion to Dismiss, p. 8.  However, Covalent is forced to ignore at least five (5) express limitations to create the impression that claim 1 is abstract.  First, Covalent alleges that claim 1 "*begins* with receiving user information."  Motion to Dismiss, p. 8 (emphasis added).  Claim 1 does not begin with receiving user information, it begins with non-abstract hardware.

| Claim Limitation | Specification | Embodiment |
|---|---|---|
| 1.  A poll-based networking system, comprising: *a data processing system having one or more processors and a memory,* the memory being specifically encoded with instructions such that when executed, the instructions cause the one or more processors to perform operations of: | Embodiments can be practiced with other computer configurations, including hand-held devices.<br><br>D.E. 22-1, the '321 Patent, col. 8, lns. 35-37. |  |

As stated in the Amended Complaint, the invention "includes an advance over the prior art and an improvement over a general-purpose computer in the form of carrying out one or more operations described in the patents on a handheld device.  The handheld device may be a personal device, such as a mobile phone."  D.E. 22, AC, ¶29.

Thus, "before the invention, the prior art did not include…carrying out one or more matching operations on a mobile phone." *Id.*, ¶32. At the motion to dismiss stage, this fact must be accepted as true. *Fleming*, 581 F.3d at 925.

According to Covalent, "the user is then asked a question with a finite number of answers." Motion to Dismiss, p. 8. This time, Covalent omits ***two*** crucial claim elements in a misguided effort to establish that claim 1 is patent ineligible, namely, "unique identification" and "receiving and storing a selected answer." *Id*.

| Claim Limitation | Specification | Embodiment |
| --- | --- | --- |
| the first question having a finite set of answers and a ***unique identification***; | The unique identification (ID) for each question and answer are embedded within the poll, starting at 0 and going to N-1, where N is the number of answers.<br><br>D.E. 22-1, '321 Patent, col. 6, lns. 2 - 3. | <br>D.E. 22-1, '321 Patent, Figure 4. |

| Claim Limitation | Specification | Embodiment |
| --- | --- | --- |
| ***receiving and storing*** a selected answer for the first polling question; | Upon receipt of a selected answer, the selected answer is separately transmitted to a plurality of match servers.<br><br>Each match server stores selected answers.<br><br>D.E. 22-1, '321 Patent, col. 6, lns. 64-66; col. 7, lns. 9-17. | <br>D.E. 22-1, '321 Patent, Figure 3. |

Using these features, the process by which answers are stored is unique. *Id.*, col. 6, lns. 53-55. "[B]efore the invention, the prior art did not include employing multiple match servers." D.E. 22, AC, ¶32. This fact must be accepted as true. *Fleming*, 581

F.3d at 925.

Covalent omits another claim limitation so that it can allege that the user's answer is compared in "some nonspecific, unidentified way to the answers of other users to see if there might be a match." Motion to Dismiss, p. 8.

| Claim Limitation | Specification | Embodiment |
|---|---|---|
| comparing the selected answer against the selected answers of other users **based on the unique identification**, to generate a likelihood of match between the user and each of the other users | Each match server can quickly generate a likelihood of match between the user and the subset of users by comparing the user's selected answers (and unique identifiers) to the selected answers (and unique identifies) of other users in its distinct subset.<br><br>D.E. 22-1, '321 Patent, col. 6, lns. 9-12. | <br>FIG. 5<br><br>D.E. 22-1, '321 Patent, Figure 5. |

The above design allows for rapid comparison and aggregation of result values even with a large number of polls and members. *Id.*, col. 7, 26-28. Specifically, the in-memory, two-dimensional array provides for linear speed across multiple match servers and an immediate comparison to determine if the user had the same answer to that of another user with respect to a particular polling question. *Id.*, col. 7, 28-32. "[B]efore the invention, the prior art did not include employing a match aggregator." D.E. 22, AC, ¶32. These facts must be accepted as true. *Fleming*, 581 F.3d at 925.

Finally, Covalent omits the limitation "within a predetermined threshold" in its entirety in the interest of alleging that user profiles are merely "displayed to the user." Motion to Dismiss, p. 8. This omission is significant since in the absence of this feature there would be no limit or logic associated with the volume or type of results a user

would receive.  The '321 Patent states that the predetermined threshold may be a match percentage (which the Motion to Dismiss also ignores).  *Id.*, col. 6, lns. 31-34.

| Claim Limitation | Specification | Embodiment |
|---|---|---|
| Displaying to the user the user profiles of other users that have a likelihood of match within a ***predetermined threshold*** | The web server displays to the user profiles other users that are most similar and fall within a predetermined threshold, which may be based on a match percentage.<br><br>D.E. 22-1, '321 Patent, col. 7, lns. 47-49. | <br>FIG. 2<br>D.E. 22-1, '321 Patent, Figure 2. |

In sum, the Motion to Dismiss engages in precisely the same erroneous analysis the Federal Circuit cautioned against—describing the invention at a "high level of abstraction and *untethered from the language of the claims*."  *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016) (emphasis added).  Suffice it to say that it is easy to allege that an invention is "abstract" when multiple non-abstract limitations have been improperly stripped out of the claim.[2]  The subject matter of claim 1 is not abstract under the correct inquiry of what the claims are "*directed to*," considered "*in light of the specification*" and based on its "*character as a whole*."  *Id.* at 1335-39 (emphasis added).  *Enfish* is instructive.  There, similar claims directed to a database that improved the way computers operated and handled data, allowing for more efficient launching and adaptation of databases, was deemed patent eligible.  *Id.*

Indeed, the Federal Circuit has "routinely held software claims patent eligible under *Alice* step one when they are directed to improvements to the functionality of a computer or network platform itself."  *Uniloc USA, Inc. v. LG Electronics USA, Inc.*,

---

[2]  Covalent makes an analogy to selecting the Yankees versus the Dodgers, however, this amounts to attorney argument that omits the same claim limitations cited above.  Motion to Dismiss, p. 8.  Argument without germane evidence cannot justify an immediate dismissal when Trinity has presented record evidence on point.

957 F.3d 1303, 1307 (Fed. Cir. 2020) (holding patent eligible a communication system comprising a primary station (*e.g.*, a base station) and at least one secondary station (*e.g.*, a computer mouse or keyboard) (citing patent-eligible computer related inventions).[3]  Thus, comparable claims that provide "new and improved technique[s]" producing "tangible and useful result[s]" fell "squarely outside of those categories of inventions that are 'directed to' patent-ineligible concepts" and survived step one. *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1048 (Fed. Cir. 2016).

The Motion to Dismiss provides absolutely no record evidence or other support for the bald allegation that humans have engaged in the same mental process of matching users or that complex protocols can be performed using a pen and paper. Motion to Dismiss, pp. 8-9.  It is self-evident that claim 1 cannot be performed mentally or with pen and paper because the improvement involves nanosecond comparison and aggregation of result values with huge numbers of polls and members.  *Id*., col. 7, 26-28.  A human cannot possibly mentally perform polling operations that rely on servers, storage, identifiers and/or thresholds.  Claim 1 is therefore not subject to the criticism that it is a "routine automation of activities" which can "all be performed by humans without a computer."  Motion to Dismiss, p. 10 (citing *Papst Licensing GmbH & Co.*

---

[3]  *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1259–60 (Fed. Cir. 2017) (claims patent eligible that "focus[ed] on a specific asserted improvement in computer capabilities," namely the accommodation of different types of *processors* without compromising performance); *Data Engine Technologies LLC v. Google LLC*, 906 F.3d 999, 1007–08 (Fed. Cir. 2018) (claims patent eligible reciting "a specific method for *navigating* through three-dimensional electronic spreadsheets"); *Core Wireless Licensing S.A.R.L. v. LG Electronics, Inc.*, 880 F.3d 1356, 1359–63 (Fed. Cir. 2018) (claim patent eligible that was directed to an improved user interface that enabled users to *more quickly access stored data* determining that the claimed invention "improve[d] the efficiency of using the electronic device by bringing together a limited list of common functions and commonly accessed stored data, which can be accessed directly from the main menu."); *see also*, *Koninklijke Kpn N.V. v. Gemalto M2M GMBH*, 942 F.3d 1143, 1151 (Fed. Cir. 2019) ("Importantly, the claims do not simply recite, without more, the mere desired result…but rather recite *a specific solution* for accomplishing that goal—i.e., *by varying the way check data is generated by modifying the permutation applied to different data blocks*"); *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1305–06 (Fed. Cir. 2018) ("The asserted claims are…directed to a non-abstract improvement in computer functionality, rather than the abstract idea of computer security writ large").

*KG v. Xilinx Inc.*, 193 F. Supp. 3d 1069, 1091 (N.D. Cal. 2016)).  The fact that the invention relates to the matching industry is in and of itself meaningless since "rules in a process specifically designed to achieve an improved technological result" may be patent eligible even if the process is in a "conventional industry practice." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1316 (Fed. Cir. 2016).

Covalent relies on legal authority that does not support its arguments and, if anything, often underscores the patent-eligibility of the '321 Patent.  For example, the Motion to Dismiss exhaustively cites *Voter Verified, Inc. v. Election Sys. & Software LLC*, 887 F.3d 1376 (Fed. Cir. 2018) for the proposition that "human cognitive actions" are "nothing more than abstract ideas."  Motion to Dismiss, p. 7.  Fair enough, but in *Voter Verified*, the patentee *admitted* that "the specification and the claims describe 'physical' and 'human cognitive actions.'"[4]  *Id*. at 1386.  Indeed, "[n]either party dispute[d] that the claims recite the use of general-purpose computers that carry out the abstract idea."  *Id*.  The patentee went so far as to fatally argue that something more than generic computer components must be necessary *because a voter* actually performs some of the claim steps.  *Id*. at 1385.[5]

Trinity has made no admissions that claim 1 is "directed to," much less requires, human activity and the steps are not being carried out by a general-purpose computer.  To the contrary, unlike in *Voter Verified*, the elements of claim 1, coupled with the specification and the allegations in the Amended Complaint (which must be accepted as true) demonstrate that the subject matter is not abstract and constitutes an improvement over general-purpose computer functionality.  *Enfish,* 822 F.3d at 1337.

---

[4]  A similar situation was presented in *Bozeman Fin. LLC v. Fed. Reserve Bank of Atlanta*, 955 F.3d 971 (Fed. Cir. 2020).  Motion to Dismiss, p. 7.  There, plaintiff argued that the method was actually a "physical process that improved handling and processing of checks, not an abstract idea."  *Id*. at 979.  Since the Motion to Dismiss does not require resolution of whether "recording or extracting data from physical documents," is "alone sufficient to render claims not abstract," *Bozeman* is irrelevant.

[5]  The *record evidence* in *Voter Verified* also reflected the fact that voting, verifying the vote and submitting it for tabulation was known in the prior art as previously being carried out by humans.  *Id*., 1385-86.

Covalent's reliance on *Elec. Power Group., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016), is also misplaced, in part, because the § 101 issue was decided at the summary judgment stage.[6]   Nonetheless, even *Elec. Power* confirms that claims "requir[ing] a new source or type of information, or new techniques for analyzing it," such as "measurement devices or techniques, that would generate new data," may constitute an inventive concept.  *Id.* at 1355 (noting that in *Enfish* "the claims at issue focused not on asserted advances in uses to which existing computer capabilities could be put, but on a specific improvement—*a particular database technique*—in how computers could carry out one of their basic functions of *storage and retrieval of data*") (emphasis added).

Subsequent decisions of the Federal Circuit have refused to apply *Elec. Power* to the same arguments Covalent advances here—*i.e.*, the claims are "simply directed to generic steps required to collect and analyze data."  *See*, *e.g.*, *SRI International, Inc. v. Cisco Systems, Inc.*, 930 F.3d 1295, 1304 (Fed. Cir. 2019).  In *SRI*, the Federal Circuit clarified that the *Elec. Power* claims "were drawn to using computers as tools…rather than improving the functionality of computers and computer networks themselves." *Id.* (citing *Elec. Power* at 1354).  In *SRI*, as here, "the claims are more like the patent-eligible claims in *DDR Holdings* [discussed, *supra*, f.n. 3].  In *DDR*, we emphasized that the claims were directed to more than an abstract idea that merely required a 'computer network operating in its normal, expected manner.'"  *Id.* (quoting *DDR* at 1258).  An invention is therefore patent eligible where "the claims actually prevent the normal, expected operation of a conventional computer network."  *Id.*

The Motion to Dismiss also cites various cases in the financial industry.  Motion to Dismiss, p. 9-10 (citing *Bozeman* (addressed, *supra*); *Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1054–56 (Fed. Cir. 2017); *Fairwarning IP, LLC v.*

---

[6]  This distinction is significant because, at the summary judgment stage, it is likely that the substantive merits have evolved, claim construction has been performed, fact and expert discovery have closed and a more developed record is available.

*Iatric Sys., Inc.*, 839 F.3d 1089, 1093 (Fed. Cir. 2016)).  Notably, *Bozeman* and *Credit Acceptance* were both appeals from the Patent Trial and Appeal Board, which does not provide the same procedural safeguards afforded in litigation at the motion to dismiss stage.  Regardless, these cases are off-point because they involved nothing more than basic computer equipment carrying out known methods that were not meaningfully distinct from the types of financial industry practices already held ineligible by the U.S. Supreme Court, including in *Alice* itself.  *Credit Acceptance* at 1054; *Bozeman* at 978-99; *Fairwarning* at 1094-1095 (distinguishing *Alice* "where the claimed computer-automated process and the prior method were carried out in the same way" from *McRO* where "it was the incorporation of the claimed rules, not the use of the computer, that improved the existing technological process." (quotations omitted).[7]

## C.    The Claims Include "Inventive Concepts" Under Step Two

Because claim 1 passes muster under step one of the *Alice* inquiry, an analysis under step two is unnecessary.  *Alice*, 573 U.S. at 217-218.  Assuming, *arguendo*, that the Court finds the claims are directed to an abstract idea, the claims still recite an "inventive concept" that provides "significantly more" and transforms the idea recited in claim 1 into a patent-eligible application in the matching field.  *Alice* at 221.

Covalent repeats many of its step one arguments in its analysis of step two, also relying on the same legal authority to re-argue that claim 1 involves a traditional "mental process" carried out on a "conventional computer system."  Motion to Dismiss, p. 11.  These arguments fail for the same reasons they failed in step one, namely,

---

[7]  The Motion to Dismiss cites a few other non-binding and unreported decisions that fail to advance the inquiry.  Motion to Dismiss, p. 10 (citing *Morsa v. Facebook, Inc.*, 77 F. Supp. 3d 1007, 1013 (C.D. Cal. 2014) and *Teradata US, Inc. v. SAP SE*, No. 20-cv-06127-WHO (N.D. Cal. Feb. 1, 2021)).  In *Morsa*, the plaintiff did not dispute (1) defendants' broad characterization of the claims, but rather, merely argued that they "bear none of the hallmarks of abstract ideas"; (2) advertisers had targeted consumers based on their demographic data long before the internet even existed; and (3) the specification posited that the patents' bidding process "applies market principles to [customer] matching on the Internet."  *Morsa* at 1013.  With respect to *Teradata*, only the case number is provided, but it appears to stand for the unhelpful premise that "patents that seek to wholly preempt others from using an abstract idea" where "computers are invoked merely as a tool" are invalid.  Motion to Dismiss, pp. 6-7, 10.

Covalent ignores the presumptively accurate record evidence that none of the following features were well-understood, routine or conventional: (1) a progressive poll that matches a user with other users in real time; (2) the use of multiple processors, match servers, unique identifications and/or a match aggregator; (3) carrying out one or more matching operations on a handheld device; or (4) a computer product in the form of a matching app.  AC, ¶33.

Under step two, Trinity's evidence "identif[ies] several ways in which its matching operations are unconventional."  *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1316 (Fed. Cir. 2019).  When accepting the allegations stated above as true, the Court "cannot conclude that the asserted claims lack an inventive concept."  *Id*. at 1318.  Likewise, Covalent merely alleging that "selecting, analyzing and displaying information" was already well-known is insufficient—"[w]hether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent is a factual determination" which "goes beyond what was simply known in the prior art."  *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1369 (Fed. Cir. 2018).

The Motion to Dismiss concedes that the Court must also look to the claims under *Alice* step two as an *ordered combination*, without ignoring the requirements of the individual steps.  Motion to Dismiss, p. 11.  This is because, even when each limitation of a claim individually is abstract or generic, "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces."  *Bascom Global Internet Servs. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016).[8]  Here, claim 1 recites steps in a non-traditional system to rapidly

---

[8]  In *Bascom*, the court agreed that all the limitations of the claim at issue, when viewed individually, were "no more than routine additional steps involving generic computer components and the Internet … to accomplish the abstract idea of filtering Internet content."  *Id*. at 1349.  However, it did not matter that the elements were individually well-known, routine, and conventional, because the ordered combination (including limitations directed to the abstract idea) provided an improvement to the technical field.  *Id*. at 1351-52 ("the claims are more than a drafting effort designed to monopolize the abstract idea.  Instead, the claims may be read to improve an existing technological process.").

connect multiple users using progressive polling that compare answers in real time based on their unique identification (ID).  D.E. 22-1, the '321 Patent, col. 1, ln. 56 - col. 3, ln. 24.  Under such circumstances, the Court has "no basis, at the pleadings stage, to say that these claimed techniques, among others, were well-known or conventional as a matter of law."  *Cellspin*, 927 F.3d at 1318 (citing *Bascom* at 1350).

*Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121 (Fed. Cir. 2018) provides another example of the proper application of step two to the present situation.  In *Aatrix*, the court held that (1) the plaintiff's concrete allegations that the claims improved computer functionalities; and (2) the ordered combination of elements was not well-understood, routine, and conventional activity were sufficient to preclude dismissal at the Rule 12(b)(6) stage.  *Id*. at 1128 ("[T]hat question [of whether the claim elements or the claimed combination are well-understood, routine, and conventional] cannot be answered adversely to the patentee based on the sources properly considered on a motion to dismiss, such as the complaint, the patent, and materials subject to judicial notice.").  Since Trinity concretely alleges that its invention improves matching efficiencies in a non-conventional manner and Covalent has not presented cognizable sources showing that allegation to be false, the Motion to Dismiss must be denied.[9]

Although Covalent alleges (again) that *Voter Verified* provides a "close analog," the case is distinguishable (again) under step two.  "In *Voter Verified*, no argument was made that the ordered combination of generic computer components transformed the claims into something other than 'well-understood, routine, or conventional' activity."  *Pure Data Systems, LLC v. Ubisoft, Inc.*, 329 F.Supp.3d 1054, 1068 (N.D. Cal. 2018) (citing *Voter Verified*, 887 F.3d at 1386).

---

[9]  Although the Motion to Dismiss references portions of the specification to support the allegation that the "abstract process can be run on generic, well-known hardware and software," each uses the term "may," none of them are tied back to claim language itself and it is the claims that define the invention, not the specification.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979–81 (Fed. Cir. 1995) (en banc) ("The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims.").

### D.    It Was Legal Error Not To Address All Of The Claims

According to Covalent, "the other claims of the '321 Patent fall together for the same reasons" as claim 1 because "claims 10 (method claim) and 19 (product claim), as well as the dependent claims (2-9, 11-18, and 20-27) merely recite additional ways to match users by their answers to questions."  Motion to Dismiss, p. 13.  However, since claim 1 does not fall at all, neither do method claims 10 or product claim 19.

Meanwhile, dependent claims 2 and 3 incorporate the same non-abstract elements of claim 1, while further reciting additional elements directed to progressive polling wherein the user is matched to all other users based upon the poll the user answered and all polls the user previously answered (based on unique identifications) to form another match percentage that is reported back to the user.  D.E. 22-1, the '321 Patent, col. 1, ln. 56 - col. 3, ln. 24, col. 6, lns. 42-47.

Likewise, dependent claim 8 incorporates the same non-abstract elements of claim 1, while further reciting greater specificity to certain encompassed hardware, including a server, a database, a match aggregator and a plurality of match servers (assigning a distinct subset to the users).  In light of the express language recited in dependent claim 8, Covalent's allegation that "no claim requires any specific, nongeneric hardware or software to perform these steps or any other part of the claimed abstract mental process" is demonstrably wrong.  Motion to Dismiss, p. 14.

Finally, Claim 19 is not invalid for the additional reason that it encompasses a computer program product in the form of a matching application (*e.g.*, "app") deployed on a mobile phone which was not known in the prior art.  D.E. 22, AC, ¶31.  Thus, the conclusion in the Motion to Dismiss that the Court need not expressly address each asserted claim "because all the claims are substantially similar and linked to the same abstract idea" is legally erroneous.  Motion to Dismiss, p. 13.

### E.    At A Minimum A Formal Claim Construction Is Required

To the extent Covalent disputes which features are encompassed in the claims of the '321 Patent, the proper result is not the granting of the Motion to Dismiss, but a

22

formal claim construction.  It is axiomatic that claim construction can affect a § 101 analysis.  *MyMail, Ltd. v. ooVoo, LLC*, 934 F.3d 1373 (Fed. Cir. 2019).  Although claim interpretation is not an inviolable prerequisite to a validity determination under § 101, the Federal Circuit has instructed that "[d]etermining patent eligibility requires a full understanding of the basic character of the claimed subject matter."  *Id*. at 1379 (citing *Bancorp Servs., LLC v. Sun Life Assurance Co. of Can.*, 687 F.3d 1266, 1273–74 (Fed. Cir. 2012) ("[I]t will ordinarily be desirable—and often necessary—to resolve claim construction disputes prior to a § 101 analysis, for the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter.")); *Aatrix Software*, 882 F.3d at 1128–30 (vacating the district court's Rule 12(b)(6) dismissal and ordering the district court to "resolve, as necessary, claim construction issues" on remand).  In the event the Court elects to engage in claim construction at the initial pleadings stage, the constructions should be read in the light most favorable to the non-moving party.  *Bascom*, 827 F.3d at 1350-51.

### F.    At A Minimum Fact Discovery Is Required

#### 1.    Fact Discovery Is Relevant To The Court's § 101 Analysis

Insufficient discovery is another factor affecting this Court's § 101 analysis.  As noted above, "whether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent is a factual determination."  *Berkheimer*, 881 at 1369; *see also Aatrix Software*, 882 F.3d at 1121; *Cronos Techs., LLC v. Expedia, Inc.*, 2015 WL 5234040, at *3 (D. Del. Sept. 8, 2015) (denying motion on the pleadings regarding claims generally disclosing methods and systems for remote ordering of products on the basis that there may be a set of facts that could result in eligibility of at least some claims.); *Slyce Acquisition*, 2020 WL at *6 (W.D. Tex. January 10, 2020) ("because resolving § 101 eligibility of all asserted claims almost certainly requires fact discovery and because fact discovery does not begin until after claim construction…the Court believes it is wiser and more efficient to wait to determine a patent's § 101 eligibility until after fact discovery has opened.").

The lack of fact discovery may be particularly problematic for dependent claims. "Each dependent claim adds an additional limitation which is not present in the independent claim such that each additional limitation may provide the inventive concept that is otherwise lacking in the independent claim." *Slyce* at *6 (citing *SAP Am., Inc. v. Investpic, LLC*, 260 F.Supp.3d 705, 715 (N.D. Tex. 2017) ("But, the Court must still analyze them under the second portion of the *Alice* test to determine if additional limitations of the dependent claims could add an inventive concept so that they address patentable subject matter.")).  Because Covalent must provide clear and convincing evidence that each of the independent and dependent claims do not provide an inventive concept, but rather, merely perform something that is "well-understood, routine, and conventional activities previously known to the industry," this further magnifies the need for fact discovery. *Berkheimer*, 881 F.3d at 1367.

### 2.     Fact Discovery Should Be Allowed To Proceed

Covalent has refused to engage in the required conference under Fed.R.Civ.P. 26(f) and is therefore avoiding service of the early discovery propounded by Trinity under Fed.R.Civ.P. 26(d)(2).  Issues relating to § 101 cannot be illuminated if a litigant can simply abstain from discovery on the basis that a Motion to Dismiss will be granted. Indeed, it is improper for a party to avoid discovery solely on this basis. *Skelluerup Industries Limited v. City of Los Angeles*, 163 F.R.D. 598 (1995) (referring to defendant's conclusory argument that discovery should be stayed on the basis that its motion to dismiss will succeed "as idle speculation") (citing *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975) ("A party seeking a stay of discovery carries a heavy burden of making a 'strong showing' why discovery should be denied"). Covalent has granted itself a *de facto* stay by avoiding the predicate of a Rule 26(f) conference and forcing Trinity to file a motion to compel a procedure that is mandatory.

This dynamic is compromising Trinity's ability to determine the nature of the accused product and infringement of additional claims in both the '321 and '685 Patents, which in turn, hinders the ability to oppose the two motions to dismiss.

Accordingly, Trinity respectfully requests prompt denial of the Motion to Dismiss, or in the alternative, a delay in the ruling so that a formal claim construction and fact discovery can take place.

## V.   CONCLUSION

For the reasons stated above, the Motion to Dismiss should be denied in full.

Dated: May 7, 2021                    Respectfully submitted,

By:   *s/ Ashley D. Posner*
Ashley D. Posner (CA Bar # 106195)
*ashleyposner@gmail.com*
POSNER LAW CORPORATION
15303 Ventura Boulevard, Suite 900
Sherman Oaks, California 91403
Telephone No. (310) 475-8520
Facsimile No. (818) 986-2203

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS