1   ASHLEY D. POSNER (California Bar No.: 106195)
2   Email: ashleyposner@gmail.com
    **POSNER LAW CORPORATION**
3   15303 Ventura Boulevard, Suite 900
    Sherman Oaks, California 91403
4   Telephone No. (310) 475-8520
    Facsimile No. (818) 986-2203
5
6   **HILLYER LEGAL, PLLC**
    Gregory L. Hillyer *(Admitted Pro Hac Vice)*
7   Email:  ghillyer@hillyerlegal.com
    5335 Wisconsin Avenue, N.W.
8   Washington, D.C. 20015
    Telephone:   (202) 686-2884
9   Facsimile:   (202) 686-2877

10  *Attorneys for Plaintiff,*
    TRINITY INFO MEDIA, LLC

11

12                  UNITED STATES DISTRICT COURT

13            FOR THE CENTRAL DISTRICT OF CALIFORNIA

14

15                                    │  Case No. 2:21-cv-01360-JWH (MRW)

16  TRINITY INFO MEDIA, LLC           │  **PLAINTIFF TRINITY INFO**
                                      │  **MEDIA, LLC'S OPPOSITION TO**
17                  Plaintiff,        │  **DEFENDANT COVALENT, INC.'S**
                                      │  **MOTION TO DISMISS**
18         v.                         │
                                      │  Judge: Hon. John W. Holcomb
19  COVALENT, INC.                    │  Hearing Date:  June 11, 2021
                                      │  Time:  9:00 am
20                  Defendant,        │  Courtroom: 2

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.      INTRODUCTION……………………………………………………...1

II.     BACKGROUND…………..………………………………………...3

        A.  The Prior Art……………………………………………………3

        B.  The Patents-In-Suit………………………………………………3

        C.  Covalent Refuses To Participate In A Scheduling Conference……………7

III.    GOVERNING LAW………………………………………………8

        A.  Federal Rule of Civil Procedure 12(b)(6)…………………………...8

        B.  Patent Analysis Under Alice's Two-Step Test……………………9

                1.  Step One……………………………………………9

                2.  Step Two……………………………………….....10

IV.     ARGUMENT……………………………………………………11

        A.  The Patents-In-Suit Are Presumed Valid Under § 101……………....11

        B.  The Claims Of The Patents-In-Suit Are Patent Eligible Under Step One...12

        C.  The Claims Include "Inventive Concepts" Under Step Two……….…...20

        D.  Additional Claims In The '321 Patent Must Be Addressed……………22

        E.  At A Minimum A Formal Claim Construction Is Required……………23

        F.  At A Minimum Fact Discovery Is Required……………………24

                1.  Fact Discovery Is Relevant To The Court's § 101 Analysis………..24

                2.  Fact Discovery Should Be Allowed To Proceed………………25

V.      CONCLUSION…………………………………………………25

# TABLE OF AUTHORITIES

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018) …………………………………………………………………………21, 23

*Aatrix Software Inc. v. Green Shades Software, Inc.*, 890 F.3d 1354, 1355 (Fed. Cir. 2018)……………………………………………………………………………11

*Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1340-41 (Fed. Cir. 2013)……………………………………………………………………………..9

*Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014)………………..9, 10, 19

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)………………………………………………..8

*Bascom Global Internet Servs., Inc. v. AT&T Mobility, LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016)……………………………………………………………...10, 11, 20, 21, 23

*Bancorp Servs., LLC v. Sun Life Assurance Co. of Can.*, 687 F.3d 1266, 1273–74 (Fed. Cir. 2012)……………………………………………………………………………23

*Berkheimer v. HP Inc.*, 881 F.3d 1360, 1369 (Fed. Cir. 2018)……………...20, 23, 24

*Bilski v. Kappos*, 561 U.S. 593, 601 (2010)……………………………………………..9

*Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975)……………………24

*Bozeman Fin. LLC v. Fed. Reserve Bank of Atlanta*, 955 F.3d 971 (Fed. Cir. 2020)……………………………………………………………………..17, 19

*Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1319 (Fed. Cir. 2019) ……11, 20, 21

*Core Wireless Licensing S.A.R.L. v. LG Electronics, Inc.*, 880 F.3d 1356, 1359–63 (Fed. Cir. 2018)……………………………………………………………………………16

*ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 766 (Fed. Cir. 2019)………2

*Cronos Techs., LLC v. Expedia, Inc.*, 2015 WL 5234040, at *3 (D. Del. Sept. 8, 2015)……………………………………………………………………23

*CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366 (Fed. Cir. 2011)……...17

*Data Engine Technologies LLC v. Google LLC*, 906 F.3d 999, 1007–08
(Fed. Cir. 2018)………………………………………………………...16

*DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1255
(Fed. Cir. 2014)………………………………………………10, 11, 18

*Diamond v. Chakrabarty*, 447 U.S. 303, 308-09 (1980)……………………………...9

*Fairwarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1093 (Fed. Cir. 2016)……19

*Elec. Power Group., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016)…...18

*Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2019)….9, 10, 15, 18

*Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1305–06 (Fed. Cir. 2018)……..16

*Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009)………………………8, 12, 13

*Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1375 (Fed. Cir. 2016)……….10

*Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346
(Fed. Cir. 2015)………………………………………………………………10

*Jedi Technologies, Inc. v. Sparks Networks, Inc.,* 2017 WL 3315279
(D. Delaware, August 3, 2017)…………………………………………………17

*Koninklijke Kpn N.V. v. Gemalto M2M GMBH*, 942 F.3d 1143, 1151
(Fed. Cir. 2019) ………………………………………………………...16

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 71 (2012)………9

*McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314
(Fed. Cir. 2016) ……………………………………………………….10, 17

*Mendiondo v. Centinela Hosp. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008)…...……..8

*Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 100 (2011)……………………11, 12

*Mortgage Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324
(Fed. Cir. 2016)……………………………………….………………………..……9

*MyMail, Ltd. v. ooVoo, LLC*, 934 F.3d 1373 (Fed. Cir. 2019)….……….....……..23

*Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998)….....……………………….8

*Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1048
(Fed. Cir. 2016)………………….……….………….…….……….……..……..16

*SAP Am., Inc. v. Investpic, LLC*, 260 F.Supp.3d 705, 715 (N.D. Tex. 2017)………..24

*Simio, LLC v. Flexsim Software Prods., Inc.,* 983 F.3d 1353 (Fed. Cir. 2020)……...12

*Skelluerup Industries Limited v. City of Los Angeles*, 163 F.R.D. 598 (1995)………24

*Slyce Acquisition, Inc. v. Syte – Visual Conception, LTD*, 2020 WL 278481, *6-7
(W.D. Tex. January 10, 2020)……………………………………………...2, 23, 24

*SRI International, Inc. v. Cisco Systems, Inc.*, 930 F.3d 1295, 1304
(Fed. Cir. 2019) …………………….……….……….………….……..……..18

*Teradata US, Inc. v. SAP SE*, No. 20-cv-06127-WHO (N.D. Cal. Feb. 1, 2021)…...19

*Uniloc USA, Inc. v. LG Electronics USA, Inc.*, 957 F.3d 1303, 1307
(Fed. Cir. 2020)……………………….……….………….…….…………….....16

*Weber v. Dep't of Veterans Affairs*, 521 F.3d 1061, 1065 (9th Cir. 2008)……………8

*Windy City Innovations, LLC v. Facebook, Inc.,* 411 F. Supp. 3d 886, 902
(N.D. Cal. 2019)………………….………….………….………….…………20, 23

*Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1259–60 (Fed. Cir. 2017)….16

*Voter Verified, Inc. v. Election Sys. & Software LLC*, 887 F.3d 1376
(Fed. Cir. 2018)………………….………….………….………….…………….17, 21

1

**Statutes**

35 U.S.C. § 101………………………………………………………..2, 9, 11, 12, 23, 24

35 U.S.C. § 282………………………………………………………………………11

Federal Rule of Civil Procedure 12(b)(6)………………………………..2, 7, 8, 11, 21

Federal Rule of Civil Procedure 26(d)(2)………………………………………7, 24

Federal Rule of Civil Procedure 26(f)………………………………………2, 7, 24

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TRINITY'S OPPOSITION TO MOTION TO DISMISS

## I.    INTRODUCTION

Prior to the inventions described and claimed in U.S. Patent Nos. 9,087,321 ("the '321 Patent") and U.S. Patent No. 10,936,685 ("the '685 Patent") ("Patents-In-Suit"), traditional internet-based matching operations were performed with antiquated processors, requiring users to provide entire fields of information before a single database could be searched for other users with similar preferences.  The equipment, process and timeframe of these protocols were cumbersome, slow and inefficient.

Trinity Info Media, LLC ("Trinity") developed a better approach using specific systems, methods and products directed to, *inter alia*: (1) progressive polling that immediately matches a user with other users in real time; (2) employing one or more processors, match servers, user identifications (IDs) and/or a match aggregator for the receipt, storage and searching of data; (3) carrying out one or more matching operations on a handheld device (*e.g.*, a mobile phone); (4) a computer program product in the form of a matching application (*e.g.*, an "app"); and (5) displaying potential matches that are reviewable through the act of swiping (*e.g.*, running a thumb or finger across the screen of a device).  None of these non-abstract solutions, either as a whole, or in the ordered combination in the claims of the Patents-In-Suit, were known in the prior art, nor do any of these improvements constitute a monopoly over any mental process.

Given the functionality of the "Kippo App," Trinity filed a Complaint against Covalent, Inc. ("Covalent") for infringement of the '321 Patent.  After the '685 Patent subsequently issued on March 2, 2021, Trinity filed an Amended Complaint to add infringement under this patent as well.  In response to the Amended Complaint, Covalent filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for one admitted reason: the Kippo App infringes claims of both of the Patents-In-Suit.

Covalent cannot meet its high burden of overcoming the presumption of validity, and proving by clear and convincing evidence, at the pleadings stage, with no claim construction and no record evidence, that *every* element of *every* claim of both Patents-In-Suit, as a whole, or as an ordered combination, are abstract ideas under 35 U.S.C. §

101.   Likewise, Covalent cannot meet the equally high burden of proving that the claimed subject matter was routine, well-known or conventional to one of ordinary skill in the art as of the priority date—over a decade ago—particularly when the allegations in the Amended Complaint to the contrary must be accepted as true.

The Motion to Dismiss itself is flawed and must be denied because it ignores the specification, omits crucial claim limitations, fails to consider claim construction, offers no actual evidentiary support and relies solely on attorney argument.  The Motion to Dismiss also focuses on a single claim in each patent while the other claims do not suffer any of the alleged § 101 infirmities.  In an effort to have it both ways, Covalent has refused to participate in a Rule 26(f) conference which is precluding service of early fact discovery under Rule 26(d)(2) directed to infringement of additional claims.

Accordingly, genuine issues of claim construction and material fact exist—including whether the claimed subject matter preempts any abstract ideas or was considered conventional activity to one of ordinary skill in the art as of the priority date of the Patents-In-Suit—that preclude granting the Motion to Dismiss at this early stage.  At a minimum, the Court should delay consideration of any invalidity motion until claim construction has been addressed and a more complete factual record exists.

Another factor that weighs heavily in favor of denying Covalent's § 101 challenge is that the applicable eligibility test is difficult to apply and is known to yield inconsistent, and at times inequitable, results.  *Slyce Acquisition, Inc. v. Syte – Visual Conception, LTD*, 2020 WL 278481, *6-7 (W.D. Tex. January 10, 2020).[1]

---

[11]  "As Judge Plager stated, 'The law . . . renders it near impossible to know with any certainty whether the invention is or is not patent eligible.'"  *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1348–56 (Fed. Cir. 2018).  Former Chief Judge Michel echoed this sentiment in testifying before the Senate Judiciary Committee, "If I, as a judge with 22 years of experience deciding patent cases on the Federal Circuit's bench, cannot predict outcomes based on case law, how can we expect patent examiners, trial judges, inventors and investors to do so?"  *The State of Patent Eligibility in America: Part I: Hearing Before the Subcomm. on Intellectual Prop. of the S. Comm. on the Judiciary*, 113th Cong. 2 (2019); Judge Linn also expressed that "the abstract idea exception is almost impossible to apply consistently and coherently…"  *Smart Sys. Innovations, LLC v. Chi. Transit Auth.*, 873 F.3d 1364, 1377 (Fed. Cir. 2017).

## II.   BACKGROUND

### A.   The Prior Art

The inventions of the Patents-In-Suit represent significant advances over the prior art, improve the previous functionality of general-purpose computers and confer other advantages over earlier matching protocols.   D.E. 22, Amended Complaint ("AC"), ¶26.   Before the invention, a plethora of social networking websites shared characteristics that merely allowed users to engage in activities over the internet using traditional computers, *i.e.*, desktop or laptop.   *Id.*.   Some of these internet-based networking websites allowed users to create profiles and find friends.   *Id.*   However, to find friends, users were required to complete entire fields as part of their profiles which permitted a search of a single database where other user profiles were stored.   *Id.*

While traditional websites may have queried the user solely for the purpose of classifying the user in predefined categories with similar groups of people, such sites could not (and did not) provide a *progressive* poll query that, in *real-time*, matched the user with other users based on using unique identifiers (IDs) within each of the polls taken.   *Id.*, ¶27.   Thus, a poll-based system, method and products, employing specific hardware, software and logic, that is capable of instantly matching a user, in real-time, with other users, while accounting for all of the polls taken by the users, wherein the results are reviewable by swiping represents a significant advance over the art.   *Id.*

### B.   The Patents-In-Suit

The application that led to the U.S. Patent No. 9,087,321 ("the '321 Patent"), entitled "Poll-Based Networking System," was filed on November 22, 2010.   D.E. 22, Exhibit 1.   After almost five years of prosecution before the United States Patent and Trademark Office, the application issued as the '321 Patent on July 21, 2015.   *Id.*   The '651 Patent (a continuation-in-part of the '321 Patent) issued on March 2, 2021.

The invention of the Patents-In-Suit have three principal aspects.   The first aspect is poll-based networking system in the form of a computer system having one or more data processors operating software which provides various functionalities and works in

cooperation with various devices, such as a handheld device (*e.g.*, mobile phone, etc.). '321 Patent, col. 5, lns. 6-13. The second aspect is a computer implemented method in the form of software and logic that generates unique identifications and uses a new processing system. *Id.*, col. 5, lns. 12-14. The third aspect is a computer program product with computer-readable instruction means stored on a readable medium, such as an application (*e.g.*, "app") deployed on a handheld device. *Id.*, col. 5, lns. 15-23.

Figure 1 of the Patents-In-Suit illustrates the novel poll-based networking system capable of producing an on-line network of users. D.E. 22-1, the '321 Patent, Fig. 1.



The way in which the claims carry out this ordered combination of operations is far from an abstract idea or mental process. The inventors unexpectedly discovered that employing a plurality of specific hardware, including processors, match servers and/or a match aggregator would allow this non-traditional system to rapidly connect multiple users with progressive polls that compare answers *in real time* based on their unique identifications (ID). D.E. 22-1, the '321 Patent, col. 1, ln. 56 - col. 3, ln. 24.

As shown above, at initiation, the processor(s) receive information from a user to generate a specific user profile. *Id.*, col. 5, lns. 58 - 60. Each match server within a plurality of match servers is assigned a distinct subset of users. *Id.*, col. 7, lns. 4-8. After saving the user profile, the user is provided with a first polling question with a finite set of answers having a unique identification. *Id.*, col. 5, lns. 60 - 65. Upon

receipt of an answer with a unique identification, it is transmitted from a web server, through a match aggregator, to the plurality of match servers, in real time as polls are answered. *Id.*, col. 6, ln. 64–col. 7, ln. 3. All match servers are therefore kept synchronized. *Id.*, col. 7, lns. 2-3. Figure 3 of the '321 Patent is illustrative. *Id.*, Fig. 3.



The unique identification (ID) for each question and answer are embedded within the poll, starting at 0 and going to N-1, where N is the number of answers.  *Id.*, col. 6, lns. 2 - 3.  Each match server stores selected answers (N) as an in-memory, two-dimensional array, with (n) bytes per selected answer and (m) rows per user (M).  *Id.*, col. 7, lns. 9-17.  Figure 4 of the '321 Patent is illustrative. *Id.*, Fig. 4.



The use of a unique identification (ID) is integral to the bucketing of users and their responses because it is an input into a hash function that "evens out" where the user information is assigned within the plurality of match servers.  Using these features,

the process by which polling answers are stored and subsequently compared is a unique function that allows for nearly instant results. *Id.*, col. 6, lns. 53-55.

This design provides a very rapid comparison and aggregation of result values even with a large number of polls and members. *Id.*, col. 7, 26-28. Specifically, the in-memory, two-dimensional array provides for linear speed across all match servers and an immediate comparison to determine if a particular user had the same answer to that of another user with respect to a particular polling question. *Id.*, col. 7, 28-32. Thus, each match server can quickly generate a likelihood of match between the user and the subset of users by comparing the user's selected answers and their associated unique identifiers to the selected answers and their associated unique identifies of other users in its distinct subset. *Id.*, col. 7, lns. 9-17, 32-34.

The match aggregator then receives from each match server a likelihood of match between the user and the other users (in each distinct subset). *Id.*, col. 7, lns. 35-39. The match aggregator compiles the likelihood of matches from the plurality of match servers in a result assembly, to generate the likelihood of match between the user and each of the other users (which provides real time updates of the distributed match servers). *Id.*, col. 7, lns. 39-44. The results are then organized into a result list which is transmitted to the server for further processing. *Id.*, col. 7, lns. 44-47. Figure 5 of the '321 Patent is illustrative. *Id.*, Fig. 5.



The server displays to the user profiles other users that are most similar and fall within a predetermined threshold, which may be a match percentage. *Id.*, col. 6, lns. 31-34; col. 7, lns. 47-49. To determine the match percentage, the total number of

6

polling questions taken by a particular user and a selected other user is determined. *Id.*, col. 6, lns. 34-37. Next, the number of same selected answers between the user and the selected other user is determined. *Id.*, col. 6, lns. 37-38. The number of the same selected answers can be divided by the total number of polling questions to generate a match percentage between the two users. *Id.*, col. 6, lns. 38-41.

When a user answers another poll, the user is matched to all other members based not only on the poll the user just answered, but also all other polls the user previously answered to form another match percentage that is reported back to the user. *Id.*, col. 6, lns. 42-47. The match percentage accounts for a maximum and minimum percentage as well as a maximum number of hits (*e.g.*, the application may request that the match server return the top 20 members with a 50% to 59% match). *Id.*, col. 6, lns. 47-52. This system design provides for a unique method of sorting and storing question and answer groups to allow for rapid matching of potentially like-minded users.

The invention also includes an advance over the prior art and an improvement over a general-purpose computer by carrying out one or more of the above operations on a handheld device (*e.g.*, a mobile phone), which enables a user to review the matches with other users through the act of swiping. *Id.*, col. 8, lns. 35-39; AC, ¶30. Another advance is a computer-program product in the form of an application (*e.g.*, "app") stored on a compatible computer-readable medium. *Id.*, col. 8, lns. 19-25; AC, ¶32.

In sum, before the invention, the prior art did not include, alone or in any ordered combination: (1) a progressive poll that matches a user with other users in real time; (2) employing multiple match servers, unique identifications (IDs) and/or a match aggregator; (3) carrying out one or more matching operations on a mobile phone; (4) carrying out one or more match operations on a computer program product in the form of an application deployed on a mobile phone; or (5) displaying potential matches that are reviewable through the act of swiping.

### C.     Covalent Refuses To Participate In A Scheduling Conference

On April 27, 2021, Trinity provided early Requests for Production of Document

under Fed.R.Civ.P. 26(d)(2) and requested availability for a Fed.R.Civ.P. 26(f) conference which would effectuate service of this discovery under this Rule.  After Trinity filed the Amended Complaint on April 28, 2021, Trinity repeated its request for a 26(f) conference.  D.E. 28.  Notwithstanding the mandate in the Rule itself that "the parties *must* confer as soon as practicable," Covalent has repeatedly refused to participate, claiming that "it makes no sense to do one now with a motion to dismiss on the horizon and no hearing on the calendar."  Covalent reiterated this position during a telephonic meet and confer held between counsel on May 5, 2021.

## III.   GOVERNING LAW

### A.   Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure Rule 12(b)(6) permits a party to move to dismiss for "failure to state a claim upon which relief can be granted."  Fed.R.Civ. P. 12(b)(6).  However, "[d]ismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  "While a complaint need not contain detailed factual allegations to survive a Rule 12(b)(6) motion, it must plead enough facts to state a claim to relief that is plausible on its face." *Weber v. Dep't of Veterans Affairs*, 521 F.3d 1061, 1065 (9th Cir. 2008).  A claim is plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

When ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept "all factual allegations in the complaint as true and construe them in light most favorable to the non-moving party."  *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009).  The Court must also accept as true all reasonable inferences to be drawn from the material allegations in the complaint.  *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998).  Although patent-eligibility under § 101 is decided as a matter of law, "[t]his legal conclusion may contain underlying factual issues."  *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1340-41 (Fed. Cir. 2013).

1

### B.    Patent Analysis Under *Alice's* Two-Step Test

2          35 U.S.C. § 101 "defines the subject matter that may be patented under the Patent

3    Act." *Bilski v. Kappos*, 561 U.S. 593, 601 (2010).  The Supreme Court has identified

4    three exceptions: "laws of nature, physical phenomena, and abstract ideas." *Diamond*

5    *v. Chakrabarty*, 447 U.S. 303, 308-09 (1980).  The concern driving the relevant

6    exception is one of pre-emption, or preventing "a monopoly over an abstract idea."

7    *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014).

8          Courts have been cautioned to "tread carefully in construing this exclusionary

9    principle lest it swallow all of patent law." *Id.* at 217 (citing *Mayo Collaborative Servs.*

10   *v. Prometheus Labs., Inc.*, 566 U.S. 66, 71 (2012)).  This is because, "[a]t some level,

11   all inventions embody, use, reflect, rest upon, or apply laws of nature, natural

12   phenomena, or abstract ideas." *Id.*  "Thus, an invention is not rendered ineligible for

13   patent simply because it involves an abstract concept." *Id.*  "Applications of such

14   concepts to a new and useful end, remain eligible for patent protection." *Id.*

### 1.    Step One

15

16         Courts apply a two-step analysis to determine whether patent claims are directed

17   to ineligible subject matter.  In step one, a court must "determine whether the claims at

18   issue are directed to one of those patent-ineligible concepts." *Id.*  If not, the claims

19   pass muster under § 101 and the inquiry ends.  *Mortgage Grader, Inc. v. First Choice*

20   *Loan Servs. Inc.*, 811 F.3d 1314, 1324 (Fed. Cir. 2016).

21         The Court of Appeals for the Federal Circuit has cautioned, in considering step

22   one, not to "describ[e] the claims at such a high level of abstraction and untethered

23   from the language of the claims [because doing so] all but ensures that the exceptions

24   to § 101 swallow the rule." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed.

25   Cir. 2019).  In particular, courts should not "simply ask whether the claims *involve* a

26   patent-ineligible concept, because essentially every routinely patent-eligible claim

27   involving physical products and actions involves a law of nature and/or natural

28   phenomenon—after all, they take place in the physical world." *Id.* at 1335-36

(emphasis in original).  Rather, the correct inquiry is what the claims are "directed to," considered in light of the specification and based on whether "their character as a whole is directed to excluded subject matter."  *Id*. (citing *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015)); *see also*, *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1375 (Fed. Cir. 2016) (inquiring into "the focus of the claimed advance over the prior art").

Claims directed to improvements in a computer's functionality are patent-eligible under step one especially when the focus of the claims is on the specific asserted improvement in computer capabilities.  *Id.*  Thus, a claim that provides "a specific means or method that improves the relevant technology" is not an abstract idea under *Alice*'s step one.  *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016).  Likewise, where a claimed invention "achieve[s] an improved technological result in conventional industry practice," it is not abstract, and the court need not reach step two.  *Id.* at 1316.

### 2. Step Two

A court proceeds to step two of the *Alice* test only if it finds in the first step that the claims are directed to a law of nature, natural phenomenon, or abstract idea.  *Alice* at 217-218.  This step requires courts to "consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application."  *Id.*; *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1255 (Fed. Cir. 2014).

The Federal Circuit has clarified that "[t]he inventive concept inquiry requires more than recognizing that each element, by itself, was known in the art."  *Bascom Global Internet Servs., Inc. v. AT&T Mobility, LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016).  Indeed, "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces."  *Id*.  With specific respect to computer technology, an inventive concept will exist in claims that "recite a specific, discrete implementation of [an] abstract idea," where the "particular arrangement of

elements is a technical improvement over prior art [methods]." *Id.* at 1350-51.  Claims directed to "a technology-based solution (not an abstract-idea-based solution implemented with generic technical components in a conventional way)…that overcome[] existing problems [in the art]" are patent-eligible under step two.  *Id.*; *see also DDR Holdings* at 1257- 1259 (holding that claims "amount[ing] to an inventive concept for resolving [a] particular Internetcentric problem" were patent-eligible).

Although the ultimate question of patent eligibility is one of law, "whether a claim element or combination of elements would have been well-understood, routine, and conventional to a skilled artisan in the relevant field at a particular point in time is a question of fact."  *Aatrix Software Inc. v. Green Shades Software, Inc.*, 890 F.3d 1354, 1355 (Fed. Cir. 2018).  At the Rule 12(b)(6) motion to dismiss stage, such factual questions "cannot be answered adversely to the patentee based on the sources properly considered on a motion to dismiss, such as the complaint, the patent, and materials subject to judicial notice."  *Id.* at 1128.

## IV.   ARGUMENT

### A.   The Patents-In-Suit Are Presumed Valid Under § 101

Patents granted by the Patent and Trademark Office are presumptively valid.  *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 100 (2011) (citing 35 U.S.C. § 282).  "This presumption reflects the fact that the Patent and Trademark Office has already examined whether the patent satisfies 'the prerequisites for issuance of a patent,' including § 101."  *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1319 (Fed. Cir. 2019) (quoting *Microsoft*, 564 U.S. at 95–96).  Accordingly, the presumption of validity extends to patent eligible subject matter.  *Id.* ("To the extent the district court . . . [concluded] that issued patents are presumed *valid* but not presumed *patent eligible*, it was wrong to do so.") (emphasis in original).  Because "issued patents are presumed to be valid[,]…an alleged infringer asserting an invalidity defense pursuant to § 101 bears the burden of proving invalidity by clear and convincing evidence."  *Microsoft* at 95.

**B.     The Patents-In-Suit Are Patent Eligible Under Step One**

The Motion to Dismiss [D.E. 30] is predicated on the subjective conclusion that claims of the Patents-In-Suit are patent-ineligible because they are directed to "the idea of matching users who gave corresponding answers to a question." Motion to Dismiss, p. 4.  However, Covalent is forced to ignore at least five (5) express limitations to create the impression that claim 1 is abstract.  First, Covalent alleges that claim 1 "***begins*** with receiving user information." Motion to Dismiss, p. 16 (emphasis added).  Claim 1 does not begin with receiving user information, it begins with non-abstract hardware.

| Claim Limitation | Specification | Embodiment |
|---|---|---|
| 1.  A poll-based networking system, comprising: ***a data processing system having one or more processors and a memory,*** the memory being specifically encoded with instructions such that when executed, the instructions cause the one or more processors to perform operations of: | Embodiments can be practiced with other computer configurations, including hand-held devices.<br><br>D.E. 22-1, the '321 Patent, col. 8, lns. 35-37. |  |

As stated in the Amended Complaint, the invention "includes an advance over the prior art and an improvement over a general-purpose computer in the form of carrying out one or more operations described in the patents on a handheld device.  The handheld device may be a personal device, such as a mobile phone." D.E. 22, AC, ¶29.  Thus, "before the invention, the prior art did not include…carrying out one or more matching operations on a mobile phone." *Id*., ¶32.  At the motion to dismiss stage, this fact must be accepted as true.[2]  *Fleming*, 581 F.3d at 925.

---

[2]  The Motion to Dismiss cites several cases for the proposition that the Court need not accept conclusory allegations.  Motion to Dismiss, p. 11.  Contrary to Covalent's contention, Trinity is not making any legal conclusions in the Amended Complaint, nor is any factual allegation wholly unsupported or made solely "by itself." *Id*. (citing *Simio, LLC v. Flexsim Software Prods., Inc.*, 983 F.3d 1353 (Fed. Cir. 2020).  To the contrary, all factual allegations are supported by meticulous citations to the record.

According to Covalent, "the user is then asked a question with a finite number of answers."  Motion to Dismiss, p. 16.  This time, Covalent omits **two** crucial claim elements in a misguided effort to establish that claim 1 is patent ineligible, namely, "unique identification" and "receiving and storing a selected answer."  *Id*.

| Claim Limitation | Specification | Embodiment |
|---|---|---|
| the first question having a finite set of answers and a ***unique identification***; | The unique identification (ID) for each question and answer are embedded within the poll, starting at 0 and going to N-1, where N is the number of answers.  D.E. 22-1, '321 Patent, col. 6, lns. 2 - 3. |   D.E. 22-1, '321 Patent, Figure 4. |

| Claim Limitation | Specification | Embodiment |
|---|---|---|
| ***receiving and storing*** a selected answer for the first polling question; | Upon receipt of a selected answer, the selected answer is separately transmitted to a plurality of match servers.  Each match server stores selected answers.  D.E. 22-1, '321 Patent, col. 6, lns. 64-66; col. 7, lns. 9-17. |   D.E. 22-1, '321 Patent, Figure 3. |

Using these features, the process by which answers are stored is unique.  *Id*., col. 6, lns. 53-55.  "[B]efore the invention, the prior art did not include…employing multiple match servers."  D.E. 22, AC, ¶32.  This fact must be accepted as true.  *Fleming*, 581 F.3d at 925.

Covalent omits another claim limitation so that it can allege that the user's answer is compared in "some nonspecific, unidentified way to the answers of other

13

users to see if there might be a match."  Motion to Dismiss, p. 16.

| Claim Limitation | Specification | Embodiment |
|---|---|---|
| comparing the selected answer against the selected answers of other users ***based on the unique identification***, to generate a likelihood of match between the user and each of the other users | Each match server can quickly generate a likelihood of match between the user and the subset of users by comparing the user's selected answers (and unique identifiers) to the selected answers (and unique identifies) of other users in its distinct subset.<br><br>D.E. 22-1, '321 Patent, col. 6, lns. 9-12. | <br><br>D.E. 22-1, '321 Patent, Figure 5. |

The non-traditional design allows for rapid comparison and aggregation of result values even with a large number of polls and members.  *Id.*, col. 7, 26-28.  Specifically, the in-memory, two-dimensional array provides for linear speed across multiple match servers and an immediate comparison to determine if the user had the same answer to that of another user with respect to a particular polling question.  *Id.*, col. 7, 28-32. "[B]efore the invention, the prior art did not include…employing a match aggregator." D.E. 22, AC, ¶32.  This fact must be accepted as true.  *Fleming*, 581 F.3d at 925.

Covalent omits the limitation "within a predetermined threshold" in its entirety in the interest of alleging that user profiles are merely "displayed to the user."  Motion to Dismiss, p. 16.  This omission is significant since in the absence of this feature there would be no limit or logic associated with the volume or type of results a user would receive.  The '321 Patent states that the predetermined threshold may be a match percentage (which the Motion to Dismiss also ignores).  *Id.*, col. 6, lns. 31-34.

| Claim Limitation | Specification | Embodiment |
|---|---|---|
| Displaying to the user the user profiles of other users that have a likelihood of match within a ***predetermined threshold*** | The web server displays to the user profiles other users that are most similar and fall within a predetermined threshold, which may be based on a match percentage.<br><br>D.E. 22-1, '321 Patent, col. 7, lns. 47-49. | <br>D.E. 22-1, '321 Patent, Figure 2. |

For purposes of the § 101 analysis, the initial elements of claim 2 of the '685 Patent are comparable to the elements above, but further adds the element of swiping.

| Claim Limitation | Specification | Embodiment |
|---|---|---|
| one or more of the operations are carried out on a hand-held device: and wherein two or more results based on the likelihood of match are displayed in a list reviewable by swiping from one result to another. | Embodiments can be practiced with other computer configurations, including hand-held devices.<br><br>D.E. 22-2, the '685 Patent, col. 10, lns. 25-27. |  |

The act of swiping match results is not an "abstract idea" and there is no record evidence to support Covalent's allegation that this limitation amounts to "appending conventional steps" at a "high level of generality." Motion to Dismiss, p. 23. The analysis of what is considered conventional cannot be determined through self-serving statements applying today's standards, but must be based on *facts* under the standards as of the priority date in *2010* when swiping match results on a mobile phone was non-conventional. As stated in the Amended Complaint, "before the invention, the prior art did not include…displaying matches or potential matches reviewable by swiping." D.E. 22, AC, ¶32. This fact must be accepted as true. *Fleming*, 581 F.3d at 925.

In sum, the Motion to Dismiss engages in precisely the same erroneous analysis the Federal Circuit cautioned against—describing the invention at a "high level of

abstraction and *untethered from the language of the claims*." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016) (emphasis added). Suffice it to say that it is easy to allege that an invention is "abstract" when multiple non-abstract limitations have been improperly stripped out of the claim.[3] The subject matter of claim 1 is not abstract under the correct inquiry of what the claims are "*directed to*," considered "*in light of the specification*" and based on its "*character as a whole*." *Id.* at 1335-39 (emphasis added). *Enfish* is instructive. There, similar claims directed to a database that improved the way computers operated and handled data, allowing for more efficient launching and adaptation of databases, was deemed patent eligible. *Id.*

Indeed, the Federal Circuit has "routinely held software claims patent eligible under *Alice* step one when they are directed to improvements to the functionality of a computer or network platform itself." *Uniloc USA, Inc. v. LG Electronics USA, Inc.*, 957 F.3d 1303, 1307 (Fed. Cir. 2020) (holding patent eligible a communication system comprising a primary station (*e.g.*, a base station) and at least one secondary station (*e.g.*, a computer mouse or keyboard) (citing patent-eligible computer related inventions).[4] Comparable claims that provide "new and improved technique[s]"

---

[3] Covalent makes an analogy to selecting the Yankees versus the Dodgers, however, this amounts to attorney argument that omits the same claim limitations cited above. Motion to Dismiss, p. 16.

[4] *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1259–60 (Fed. Cir. 2017) (claims patent eligible that "focus[ed] on a specific asserted improvement in computer capabilities," namely the accommodation of different types of *processors* without compromising performance); *Data Engine Technologies LLC v. Google LLC*, 906 F.3d 999, 1007–08 (Fed. Cir. 2018) (claims patent eligible reciting "a specific method for *navigating* through three-dimensional electronic spreadsheets"); *Core Wireless Licensing S.A.R.L. v. LG Electronics, Inc.*, 880 F.3d 1356, 1359–63 (Fed. Cir. 2018) (claim patent eligible that was directed to an improved user interface that enabled users to *more quickly access stored data* determining that the claimed invention "improve[d] the efficiency of using the electronic device by bringing together a limited list of common functions and commonly accessed stored data, which can be accessed directly from the main menu."); *see also*, *Koninklijke Kpn N.V. v. Gemalto M2M GMBH*, 942 F.3d 1143, 1151 (Fed. Cir. 2019) ("Importantly, the claims do not simply recite, without more, the mere desired result…but rather recite *a specific solution* for accomplishing that goal—i.e., *by varying the way check data is generated by modifying the permutation applied to different data blocks*"); *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1305–06 (Fed. Cir. 2018) ("The asserted claims are…directed to a non-abstract improvement in computer functionality, rather than the abstract idea of computer security writ large").

producing "tangible and useful result[s]" fell "squarely outside of those categories of inventions that are 'directed to' patent-ineligible concepts" and survived step one. *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1048 (Fed. Cir. 2016).

The Motion to Dismiss provides no record evidence or other support for the allegation that humans have mentally engaged in the same *claimed* process of matching users. Motion to Dismiss, pp. 1-2. It is self-evident that claim 1 cannot be performed mentally because the improvement involves nanosecond comparisons and aggregations of result values with huge numbers of polls and members. *Id*., col. 7, 26-28. A human cannot mentally perform polling operations that use selection criteria involving servers, storage, identifiers and/or thresholds. Claim 1 is therefore not subject to the criticism that it is a routine automation of activities which can all be performed by humans without a computer. Motion to Dismiss, p. 15 (citing *CyberSource Corp. v. Retail Decisions, Inc.,* 654 F.3d 1366, 1373 (Fed. Cir. 2011)).

Covalent relies on legal authority that does not support its arguments and often underscores the patent-eligibility of the Patents-In-Suit. For example, the Motion to Dismiss exhaustively cites the district court case *Jedi Technologies, Inc. v. Sparks Networks, Inc.*, 2017 WL 3315279 (D. Delaware, August 3, 2017) for the proposition that matchmaking was performed prior to the Patents-In-Suit. Motion to Dismiss, pp. 1, 17, 18. This is unremarkable since both the Amended Complaint and the Patents-In-Suit note the shortcomings of the prior art in this field. The fact that the invention relates to the matching industry is meaningless since "rules in a process specifically designed to achieve an improved technological result" may be patent eligible even if the process is in a "conventional industry practice." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1316 (Fed. Cir. 2016). The reason the claims in *Jedi* were patent ineligible was because the steps constituted "routine data gathering" and Jedi failed to "identify any specific improvement to the functionality of a computer." *Id*. at *8. As shown in excruciating detail above, that is simply not the situation here.

The Motion to Dismiss also cites *Voter Verified, Inc. v. Election Sys. & Software*

*LLC*, 887 F.3d 1376 (Fed. Cir. 2018) for the proposition that human cognitive actions are nothing more than abstract ideas.  Motion to Dismiss, p. 8.  Fair enough, but in *Voter Verified*, the patentee *admitted* that "the specification and the claims describe …'human cognitive actions.'"[5]  *Id*. at 1386.  Indeed, "[n]either party dispute[d] that the claims recite the use of general-purpose computers that carry out the abstract idea." *Id*.  The patentee went so far as to fatally argue that something more than generic computer components must be necessary *because a voter* actually performs some of the claim steps.  *Id*. at 1385.[6]

Trinity has made no admissions that claim 1 is "directed to," much less requires, human cognitive function and the steps are not being carried out by a general-purpose computer.  To the contrary, unlike in *Voter Verified*, the elements of the claims, coupled with the specification and the allegations in the Amended Complaint (which must be accepted as true) demonstrate that the subject matter is not abstract and constitutes an improvement over general-purpose computer functionality.  *Enfish,* 822 F.3d at 1337.

Covalent's reliance on *Elec. Power Group., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016), is also misplaced, in part, because the § 101 issue was decided at the summary judgment stage.[7]  Nonetheless, even *Elec. Power* confirms that claims "requir[ing] a new source or type of information, or new techniques for analyzing it," such as "measurement devices or techniques, that would generate new data," may constitute an inventive concept.  *Id.* at 1355 (noting that in *Enfish* "the claims at issue

---

[5]  A similar situation was presented in *Bozeman Fin. LLC v. Fed. Reserve Bank of Atlanta*, 955 F.3d 971 (Fed. Cir. 2020).  Motion to Dismiss, p. 9.  There, plaintiff argued that the method was actually a "physical process that improved handling and processing of checks, not an abstract idea."  *Id*. at 979.  Since the Motion to Dismiss does not require resolution of whether "recording or extracting data from physical documents," is "alone sufficient to render claims not abstract," *Bozeman* is irrelevant.

[6]  The *record evidence* in *Voter Verified* also reflected the fact that voting, verifying the vote and submitting it for tabulation was known in the prior art as previously being carried out by humans.  *Id*., 1385-86.

[7]  This distinction is significant because, at the summary judgment stage, it is likely that the substantive merits have evolved, claim construction has been performed, fact and expert discovery have closed and a more developed record is available.

focused not on asserted advances in uses to which existing computer capabilities could be put, but on a specific improvement—a particular database technique—in how computers could carry out one of their basic functions of storage and retrieval of data").

Subsequent decisions of the Federal Circuit have refused to apply *Elec. Power* to the same argument Covalent advances here—*i.e.*, the claims are "simply directed to generic steps required to collect and analyze data." *See*, *e.g.*, *SRI International, Inc. v. Cisco Systems, Inc.*, 930 F.3d 1295, 1304 (Fed. Cir. 2019). In *SRI*, the Federal Circuit clarified that the *Elec. Power* claims "were drawn to using computers as tools…rather than improving the functionality of computers and computer networks themselves." *Id*. (citing *Elec. Power* at 1354). In *SRI*, as here, "the claims are more like the patent-eligible claims in *DDR Holdings* [discussed, *supra*, f.n. 3]. In *DDR*, we emphasized that the claims were directed to more than an abstract idea that merely required a 'computer network operating in its normal, expected manner.'" *Id*. (quoting *DDR* at 1258). An invention is therefore patent eligible where "the claims actually prevent the normal, expected operation of a conventional computer network." *Id*.

The Motion to Dismiss also cites various cases in the financial industry. Motion to Dismiss, p. 18-19 (citing *Bozeman* (addressed, *supra*) and *Fairwarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1093 (Fed. Cir. 2016)). Notably, *Bozeman* was an appeal from the Patent Trial and Appeal Board, which does not provide the same procedural safeguards afforded in litigation at the motion to dismiss stage. Regardless, these cases are off-point because they involved nothing more than basic computer equipment carrying out known methods that were not meaningfully distinct from the types of financial industry practices already held ineligible by the U.S. Supreme Court, including in the *Alice* decision itself. *Bozeman* at 978-99; *Fairwarning* at 1094-1095 (distinguishing *Alice* "where the claimed computer-automated process and the prior method were carried out in the same way" from *McRO* where "it was the incorporation of the claimed rules, not the use of the computer, that improved the existing

1  technological process." (quotations omitted)).[8]

2  ### C.   The Claims Include "Inventive Concepts" Under Step Two

3  Because claim 1 passes muster under step one of the *Alice* inquiry, an analysis

4  under step two is unnecessary.  *Alice*, 573 U.S. at 217-218.  Assuming, *arguendo*, that

5  the Court finds the claims are directed to an abstract idea, the claims still recite an

6  "inventive concept" that provides "significantly more" and transforms the idea recited

7  in claim 1 into a patent-eligible application in the matching field.  *Alice* at 221.

8  Covalent's step two arguments fail for many of the same reasons they failed in

9  step one, namely, Covalent ignores the presumptively accurate record evidence that

10  none of the following features were well-understood, routine or conventional: (1) a

11  progressive poll that matches a user with other users in real time; (2) the use of multiple

12  processors, match servers, unique identifications and/or a match aggregator; (3)

13  carrying out one or more matching operations on a handheld device; or (4) a computer

14  product in the form of a matching app; and (4) results reviewable by swiping.  AC, ¶32.

15  Covalent's warning that, in step two, the claims must be "scrutinized," with particular

16  attention paid to "claim language" and relevant "portions of the specification" is ironic

17  since its purported analysis re-wrote the claims to strike out several elements and

18  wholly ignored the written description.  Motion to Dismiss, p. 20 (citing *Windy City*

19  *Innovations, LLC v. Facebook, Inc.*, 411 F. Supp. 3d 886, 902 (N.D. Cal. 2019).

20  Trinity's evidence "identif[ies] several ways in which its matching operations

21  are unconventional."  *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1316 (Fed. Cir.

22  2019).  When accepting the allegations stated above as true, the Court "cannot conclude

23  that the asserted claims lack an inventive concept."  *Id*. at 1318.  Likewise, Covalent

24  merely alleging that selecting, analyzing and displaying information was already well-

25  ─────────────

26  [8]  The Motion to Dismiss cites a few other non-binding and unreported decisions that
fail to advance the inquiry.  Motion to Dismiss, p. 13 (citing *Teradata US, Inc. v. SAP

27  SE*, No. 20-cv-06127-WHO (N.D. Cal. Feb. 1, 2021)).  With respect to *Teradata*, only
the case number is provided, but it appears to stand for the unhelpful premise that

28  patents that seek to wholly preempt others from using an abstract idea where computers
are invoked merely as a tool are invalid.  *Id*.

known is insufficient—"[w]hether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent is a *factual determination*" which "goes beyond what was simply known in the prior art." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1369 (Fed. Cir. 2018) (emphasis added).

The Motion to Dismiss concedes that the Court must also look to the claims under *Alice* step two as an *ordered combination*, without ignoring the requirements of the individual steps.  Motion to Dismiss, p. 13.  This is because, even when each limitation of a claim individually is abstract or generic, "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Bascom Global Internet Servs. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016).[9]  Here, claim 1 recites steps in a non-traditional system to rapidly connect multiple users using progressive polling that compare answers in real time based on their unique identification (ID).  D.E. 22-1, the '321 Patent, col. 1, ln. 56 - col. 3, ln. 24.  Under such circumstances, the Court has "no basis, at the pleadings stage, to say that these claimed techniques, among others, were well-known or conventional as a matter of law." *Cellspin*, 927 F.3d at 1318 (citing *Bascom* at 1350).

*Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121 (Fed. Cir. 2018) provides an example of the proper application of step two to the present situation.  In *Aatrix*, the court held that (1) the plaintiff's concrete allegations that the claims improved computer functionalities; and (2) the ordered combination of elements was not well-understood, routine, and conventional activity were sufficient to preclude dismissal at the Rule 12(b)(6) stage.  *Id*. at 1128 ("[T]hat question [of whether the claim

---

[9]  In *Bascom*, the court agreed that all the limitations of the claim at issue, when viewed individually, were "no more than routine additional steps involving generic computer components and the Internet … to accomplish the abstract idea of filtering Internet content." *Id*. at 1349.  However, it did not matter that the elements were individually well-known, routine, and conventional, because the ordered combination (including limitations directed to the abstract idea) provided an improvement to the technical field. *Id*. at 1351-52 ("the claims are more than a drafting effort designed to monopolize the abstract idea.  Instead, the claims may be read to improve an existing technological process.").

elements or the claimed combination are well-understood, routine, and conventional] cannot be answered adversely to the patentee based on the sources properly considered on a motion to dismiss, such as the complaint, the patent, and materials subject to judicial notice.").  Since Trinity concretely alleges that its invention improves matching efficiencies in a non-conventional manner and Covalent has not presented cognizable sources showing that allegation to be false, the Motion to Dismiss must be denied.[10]

### D.   Additional Claims Of The '321 Patent Must Be Addressed

According to Covalent, the other claims of the '321 Patent fall together for the same reasons as claim 1 because claims 10 (method claim) and 19 (product claim), as well as the dependent claims (2-9, 11-18, and 20-27) merely recite additional ways to match users by their answers to questions.  Motion to Dismiss, p. 24.  However, since claim 1 does not fall at all, neither do method claims 10 or product claim 19.

Meanwhile, dependent claims 2 and 3 incorporate the same non-abstract elements of claim 1, while further reciting additional elements directed to progressive polling wherein the user is matched to all other users based upon the poll the user answered and all polls the user previously answered (based on unique identifications) to form another match percentage that is reported back to the user.  D.E. 22-1, the '321 Patent, col. 1, ln. 56 - col. 3, ln. 24, col. 6, lns. 42-47.

Likewise, dependent claim 8 incorporates the same non-abstract elements of claim 1, while further reciting greater specificity to certain encompassed hardware, including a server, a database, a match aggregator and a plurality of match servers (assigning a distinct subset to the users).  In light of the express language recited in dependent claim 8, Covalent's allegation that "no claim requires any specific,

---

[10]  Although the Motion to Dismiss references portions of the specification to support the allegation that the "abstract process can be run on generic, well-known hardware and software," each instance uses the term "may," none of them are tied back to claim language itself and it is the claims that define the invention, not the specification. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979–81 (Fed. Cir. 1995) (en banc) ("The written description part of the specification itself does not delimit the right to exclude.  That is the function and purpose of claims.").

1    nongeneric hardware or software to perform these steps or any other part of the claimed

2    abstract mental process" is demonstrably wrong.  Motion to Dismiss, p. 24.

3        Finally, Claim 19 is not invalid for the additional reason that it encompasses a

4    computer program product in the form of a matching application (*e.g.*, "app") deployed

5    on a mobile phone which was not known in the prior art.  D.E. 22, AC, ¶31.  Thus, the

6    conclusion in the Motion to Dismiss that the Court need not expressly address each

7    asserted claim because all the claims are substantially similar and linked to the same

8    abstract idea is legally erroneous.  Motion to Dismiss, p. 13.

9        **E.    At A Minimum A Formal Claim Construction Is Required**

10       To the extent Covalent disputes which features are encompassed in the claims of

11   the Patents-In-Suit, the proper result is not the granting of the Motion to Dismiss, but

12   a formal claim construction.  Although Covalent spends much effort arguing that "the

13   specification cannot be used to import details from the specification if those details are

14   not claimed," the only way to know if the details are claimed is to conduct a claim

15   construction.  Motion to Dismiss, pp. 14, 20 (citing *ChargePoint, Inc. v. SemaConnect,*

16   *Inc.*, 920 F.3d 759, 766 (Fed. Cir. 2019) and *Windy City*, 411 F.Supp. 3d at 902).

17       It is axiomatic that claim construction can affect a § 101 analysis.  *MyMail, Ltd.*

18   *v. ooVoo, LLC*, 934 F.3d 1373 (Fed. Cir. 2019).  Although claim interpretation is not

19   an inviolable prerequisite to a validity determination under § 101, the Federal Circuit

20   has instructed that "[d]etermining patent eligibility requires a full understanding of the

21   basic character of the claimed subject matter."  *Id.* at 1379 (citing *Bancorp Servs., LLC*

22   *v. Sun Life Assurance Co. of Can.*, 687 F.3d 1266, 1273–74 (Fed. Cir. 2012) ("[I]t will

23   ordinarily be desirable—and often necessary—to resolve claim construction disputes

24   prior to a § 101 analysis, for the determination of patent eligibility requires a full

25   understanding of the basic character of the claimed subject matter.")); *Aatrix Software*,

26   882 F.3d at 1128–30 (vacating the district court's Rule 12(b)(6) dismissal and ordering

27   the district court to "resolve, as necessary, claim construction issues" on remand).  In

28   the event the Court elects to engage in claim construction at the initial pleadings stage,

1    the constructions should be read in the light most favorable to the non-moving party.

2    *Bascom*, 827 F.3d at 1350-51.

3           **F.**    **At A Minimum Fact Discovery Is Required**

4           **1.**    **Fact Discovery Is Relevant To The Court's § 101 Analysis**

5          Insufficient discovery is another factor affecting this Court's § 101 analysis.  As

6    noted above, "whether something is well-understood, routine, and conventional to a

7    skilled artisan at the time of the patent is a factual determination."  *Berkheimer*, 881 at

8    1369; *see also Aatrix Software*, 882 F.3d at 1121; *Cronos Techs., LLC v. Expedia, Inc.*,

9    2015 WL 5234040, at *3 (D. Del. Sept. 8, 2015) (denying motion on the pleadings

10   regarding claims generally disclosing methods and systems for remote ordering of

11   products on the basis that there may be a set of facts that could result in eligibility of at

12   least some claims.); *Slyce Acquisition*, 2020 WL at *6 (W.D. Tex. January 10, 2020)

13   ("because resolving § 101 eligibility of all asserted claims almost certainly requires

14   fact discovery and because fact discovery does not begin until after claim

15   construction…the Court believes it is wiser and more efficient to wait to determine a

16   patent's § 101 eligibility until after fact discovery has opened.").

17         The lack of fact discovery may be particularly problematic for dependent claims.

18   "Each dependent claim adds an additional limitation which is not present in the

19   independent claim such that each additional limitation may provide the inventive

20   concept that is otherwise lacking in the independent claim."  *Slyce* at *6 (citing *SAP

21   Am., Inc. v. Investpic, LLC*, 260 F.Supp.3d 705, 715 (N.D. Tex. 2017) ("But, the Court

22   must still analyze them under the second portion of the *Alice* test to determine if

23   additional limitations of the dependent claims could add an inventive concept so that

24   they address patentable subject matter.")).  Because Covalent must provide clear and

25   convincing evidence that each of the independent and dependent claims do not provide

26   an inventive concept, but rather, merely perform something that is "well-understood,

27   routine, and conventional activities previously known to the industry," this further

28   magnifies the need for fact discovery.  *Berkheimer*, 881 F.3d at 1367.

### 2.    Fact Discovery Should Be Allowed To Proceed

Covalent has refused to engage in the required conference under Fed.R.Civ.P. 26(f) and is therefore avoiding service of the early discovery propounded by Trinity under Fed.R.Civ.P. 26(d)(2).  Issues relating to § 101 cannot be illuminated if a litigant can simply abstain from discovery on the basis that a Motion to Dismiss will be granted.  Indeed, it is improper for a party to avoid discovery solely on this basis.  *Skelluerup Industries Limited v. City of Los Angeles*, 163 F.R.D. 598 (1995) (referring to defendant's conclusory argument that discovery should be stayed on the basis that its motion to dismiss will succeed "as idle speculation") (citing *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975) ("A party seeking a stay of discovery carries a heavy burden of making a 'strong showing' why discovery should be denied").  Covalent has granted itself a *de facto* stay by avoiding the predicate of a Rule 26(f) conference and forcing Trinity to file a motion to compel a procedure that is mandatory.

This dynamic is compromising Trinity's ability to determine the nature of the accused product and infringement of additional claims in both the Patents-In-Suit, which in turn, hinders the ability to oppose the motions to dismiss.  Accordingly, Trinity respectfully requests prompt denial of both Motions to Dismiss, or in the alternative, a delay in the ruling so that a formal claim construction and fact discovery can take place.

## V.    CONCLUSION

For the reasons stated above, the Motions to Dismiss should be denied in full.

Dated: May 21, 2021                    Respectfully submitted,

By:   *s/ Ashley D. Posner*
        Ashley D. Posner (CA Bar # 106195)
        *ashleyposner@gmail.com*
        POSNER LAW CORPORATION
        15303 Ventura Boulevard, Suite 900
        Sherman Oaks, California 91403
        Telephone No. (310) 475-8520
        Facsimile No. (818) 986-2203